David S. FORSTER, Appellant/Cross–Appellee,

v.

STATE of Alaska, Appellee/Cross–Appellant.

Nos. A–9470, A–9490.

Court of Appeals of Alaska.

July 30, 2010.

Josie Garton and Margi Mock, Assistant Public Defenders, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

BOLGER, Judge.

David S. Forster shot and killed a police officer. Forster moved to suppress the statements he made during several interrogations following his arrest, arguing that he was mentally incapable of waiving his *Miranda* rights[1] and that the interrogations that followed his first court appearance violated his right to counsel.

The superior court suppressed Forster's statements from the first interrogation after concluding that Forster's mental condition prevented him from knowingly and intelligently waiving his *Miranda* rights. The court also suppressed the statements Forster made in his final interrogation, ruling that he was questioned in violation of his right to counsel. Forster now argues that the superior court also should have suppressed his statements in the second, third, and fourth interrogations. We affirm the superior court's decisions that Forster was capable of a knowing and intelligent waiver during his second and third interrogations, and that Forster's first court appearance sufficiently dissipated the taint associated with the *Miranda* violation in his first interrogation. We also uphold the court's decisions that Forster waived his right to counsel before the second, third, and fourth interrogations.

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

On cross-appeal, the State argues that the superior court was required to impose a mandatory 99–year sentence even though there was no jury finding that the victim was a police officer engaged in official duties. We affirm the superior court's decision not to restrict Forster's good-time credit without a jury determination on this issue, but we conclude that the court was required to restrict Forster's eligibility for discretionary parole.

### Facts and proceedings

On Christmas Day in 2003, shortly after 8:00 in the evening, Kenai Police Officer John Watson approached David Forster in the driveway of Forster's home to conduct a welfare check based on a report that Forster had been behaving strangely, was possibly driving under the influence, and that his fiancée, Crystal Hallman, who was with him, seemed upset and frightened. During this contact, Forster obtained Officer Watson's gun and shot him in the back and head. After the shooting, Forster retreated into his house until he was persuaded to surrender about five hours later.

Forster was ultimately convicted of first-degree murder[2] for killing Officer Watson and of three counts of third-degree assault[3] for conduct involving Hallman and two of the officers involved in his apprehension. He was sentenced to a composite term of 101 years to serve, including a 99–year term for the murder.

After his arrest, Forster was advised of his *Miranda* rights and questioned several times by the state troopers. The first interrogation was conducted by Alaska State Trooper Investigator Jane Schied on December 26 at 12:11 p.m. at the Kenai courthouse shortly before Forster's first court appearance. Investigator Schied interrogated Forster a second time after his first court appearance, at 2:20 p.m. at the same location. The third interrogation was conducted by Investigator Schied on December 27 at 9:35 a.m. at Wildwood Pretrial Facility.

Forster initiated the fourth interrogation by telling a corrections sergeant at Wildwood

that he wanted to speak with an investigator. This interrogation was conducted by Alaska State Trooper Investigator Dane Gilmore on December 28 at 11:08 a.m. Forster also initiated the fifth and final interrogation with Investigator Schied on December 30 at noon at Wildwood.

Before trial, Forster moved to suppress the statements he made during these interrogations, arguing that he was mentally ill and suffering from delusions when he was questioned and that he did not knowingly and intelligently waive his *Miranda* rights. He argued that the *Miranda* violations in each interrogation tainted his consent to later interrogations. He also argued that all the interrogations that took place after his first appearance before District Court Judge David S. Landry violated his Sixth Amendment right to counsel.

A hearing on Forster's suppression motion was held before Superior Court Judge Donald D. Hopwood. At that hearing, Forster offered evidence of his mental condition prior to the shooting and in the ensuing days when he was interrogated. He also presented the expert testimony of Dr. Susan LaGrande, a licensed clinical psychologist. Dr. LaGrande concluded that Forster had suffered a psychotic break and was not capable of providing a knowing and intelligent waiver until sometime after his last interrogation on December 30. She found that throughout the interrogations Forster was sleep deprived, clearly delusional, and responding to both auditory and visual hallucinations. She also opined that at the time that he was interrogated Forster did not fully comprehend that he was being charged with a crime, that he had the right to speak to an attorney, or what manner of legal assistance could be rendered.

The State relied primarily on the testimony of the troopers who had contact with Forster and on the content of the interrogations. The primary interrogator, Investigator Schied, conducted the first interrogation on December 26, and Forster spoke for most of that interrogation, about forty minutes, about the devil and how the devil had been

---

2. AS 11.41.100(a)(1)(A).

3. AS 11.41.220(a)(1)(A).

after him on the night of the shooting. But Schied testified that during this and later interrogations, when she asked Forster direct questions about the shooting, he was rational and able to answer her questions. Schied testified that Forster appeared to understand his *Miranda* rights and he said that he understood them.

Investigator Gilmore testified that he had contact with Forster before Investigator Schied interrogated Forster on the morning of December 26, when Gilmore advised Forster of his *Miranda* rights, and Forster declined to be interviewed. Investigator Gilmore did not meet with Forster again until December 28. On that date, Gilmore again advised Forster of his *Miranda* rights, and Forster agreed to talk. Gilmore characterized Forster as calm, cooperative, and responsive at that time.

After hearing the evidence, Judge Hopwood suppressed Forster's statements during the first interrogation with Investigator Schied on December 26, finding that Forster's disturbed mental condition prevented him from knowingly and intelligently waiving his rights. But Judge Hopwood found that Forster's mental condition improved quickly after he had rest and his stress lessened. Forster then began to demonstrate an "increasing understanding and sophistication about what was at stake and what he wanted to talk about, and how he could ... get information from the officers without giving them more information."

In subsequent interrogations, Forster was able "to assemble elaborate detail and lengthy descriptions of events[, m]uch of [which] was corroborated by other evidence," and he was able to detect inconsistencies and attempt to correct them. For instance, on December 28, after Investigator Gilmore confronted Forster with conflicts in his and his fiancée Hallman's statements, Forster called his friend Jesse Tubbs and told him to tell Hallman to be careful what she told the police.

Judge Hopwood found that Forster's mental condition had improved enough for him to knowingly and intelligently waive his rights during the second, third, and fourth interrogations. Applying the test in *Brown v. Illinois*,[4] he also rejected Forster's claim that his consent to these interrogations was tainted by the earlier *Miranda* violation.

Judge Hopwood suppressed Forster's statements in the fifth, and last, interrogation, finding that Forster was questioned in violation of his Sixth Amendment right to counsel because by that time he had filed a request for appointed counsel. Judge Hopwood also ruled that Investigator Schied violated Forster's rights to silence and counsel by continuing to question him after he invoked those rights.

### Discussion
#### Did Forster knowingly and intelligently waive his Miranda rights?

Forster argues that he did not knowingly and intelligently waive his *Miranda* rights during the second and third interrogations, mainly challenging the validity of his waiver before the second interrogation. As already explained, Judge Hopwood found that Forster's mental condition prevented him from knowingly and intelligently waiving his rights during the first interrogation, but he found that Forster validly waived his rights in the second interrogation, which began just fifty minutes after the first interrogation ended.

The State has the burden to prove by a preponderance of the evidence that Forster intentionally relinquished his *Miranda* rights.[5] We look at the totality of the circumstances in determining if the State met that burden.[6] We must uphold the trial court's factual findings unless they are clearly erroneous, but we independently determine whether Forster's waiver was knowing

**4.** 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

**5.** *Giacomazzi v. State,* 633 P.2d 218, 222 & n. 4 (Alaska 1981); *McMahan v. State,* 617 P.2d 494, 498 (Alaska 1980).

**6.** *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

and intelligent, viewing the facts in the light most favorable to the judge's ruling.[7]

The transcript of the second interrogation shows that Forster expressed a clear and unequivocal waiver of his *Miranda* rights. But Forster argues that he was suffering from delusions that made him incapable of a knowing and intelligent waiver. He asserts that he continued to be in "a highly disturbed state" during the second interrogation and that his purported *Miranda* waiver was "inextricably linked to his delusion."

We must first determine what level of understanding a mentally ill suspect must have of his *Miranda* rights to knowingly and intelligently waive those rights. Forster urges this court to apply the analysis in *Adams v. State*.[8] In *Adams*, we ruled that a mentally ill defendant was not competent to waive his right to counsel and represent himself at trial because "his paranoid delusions affected his perception of the evidence and fettered any ability to appreciate the extent of his own disability" such that he was "unable either to be fully aware of the risk of self-representation or to rationally conceive and coherently present a defense."[9] Forster relies on *Adams* to argue that a waiver of *Miranda* rights is not knowing and intelligent if the waiver is "inextricably linked to [the defendant's] delusion or psychosis."

■ *Adams* addressed whether a mentally ill defendant was capable of representing himself at trial. We do not believe that this analysis is appropriate to evaluate whether a defendant knowingly and intelligently waived his *Miranda* rights. As the United States Supreme Court recently explained in *Indiana v. Edwards*,[10] a defendant might be

fully competent to waive rights, including the right to counsel, but still be "unable to carry out the basic tasks needed to present his own defense without the help of counsel."[11]

There are no Alaska cases directly addressing the claim that a waiver of *Miranda* rights was not knowing and intelligent because of mental illness.[12] Absent Alaska authority directly on point, Judge Hopwood applied the rule articulated by the Supreme Court in *Colorado v. Spring*[13] to assess whether Forster's *Miranda* waiver was knowing and intelligent. In *Spring*, the defendant expressly waived his *Miranda* rights but later moved to suppress his confession, arguing that his waiver was not knowing and intelligent because the police never told him he would be questioned about his involvement in a murder.[14] The Supreme Court rejected Spring's claim, ruling that a knowing and intelligent waiver does not require that a suspect "know and understand every possible consequence of a waiver of the Fifth Amendment privilege."[15] The Supreme Court observed that Spring did not allege that he did not understand his *Miranda* rights or the consequences of speaking with law enforcement.[16]

Similarly, in *Moran v. Burbine*[17] the Supreme Court held that the defendant's *Miranda* waiver was knowing and intelligent even though the police failed to inform him of his attorney's efforts to reach him prior to the interrogation.[18] The Court explained that the constitution did not require the police to supply a suspect "with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his

**7.** See *Nashoalook v. State*, 663 P.2d 975, 979 & n. 2 (Alaska App.1983).

**8.** 829 P.2d 1201 (Alaska App.1992).

**9.** *Id.* at 1206.

**10.** 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008).

**11.** *Id.*, 128 S.Ct. at 2386.

**12.** *But see Schade v. State*, 512 P.2d 907, 916 (Alaska 1973) (concluding that mental illness is one of several factors which must be weighed in determining whether a confession is voluntary).

**13.** 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

**14.** *Id.* at 567–69, 573, 107 S.Ct. at 853–55, 857.

**15.** *Id.* at 574–75, 107 S.Ct. at 857–58.

**16.** *Id.*

**17.** 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

**18.** *Id.* at 420–24, 106 S.Ct. at 1140–42.

rights"; a waiver is valid as long as the "suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction." [19]

▮ Lower courts addressing a *Miranda* waiver by a mentally ill suspect treat mental illness as just one factor in the totality of the circumstances.[20] Some courts have found that mental illness did not vitiate a facially valid waiver.[21] Other courts have found that the defendant was too mentally ill to knowingly and intelligently waive *Miranda* rights.[22] The general rule we discern from these cases is the one Judge Hopwood applied: A *Miranda* waiver is knowing and intelligent if the record shows that the defendant "had at least a basic understanding of the *Miranda* rights and what a waiver of those rights entailed." [23] As Judge Hopwood emphasized, the defendant need not be "totally rational."

Judge Hopwood found that in the days before the December 25 shooting, and for a period of time after he was taken into custody early on the morning of December 26, Forster was "under stress, he was having difficulty thinking rationally, he was not connected to reality, he was exhibiting bizarre behavior and thought processes in patterns, he had audio hallucinations and was having difficulty functioning on a reality level and on

a normal level." Prior to the first interrogation on December 26, Forster had been on suicide watch, he had complained he was cold, and he objected to being in jail with people he thought were crazy.

During that one-hour interrogation, Forster spent some forty minutes talking about "the influence of the devil ... and Satan, and these types of thoughts." He was incoherent at times, and he made "a lot of bizarre references ... that he was a prophet, that there were prophets at his house, there was the presence of Jesus there, [and that] his mother was a virgin." Judge Hopwood found that Forster's response to the *Miranda* warnings—"you give me my rights and I'll tell you what I'm feeling"—did not indicate an awareness of his rights or of the consequences of waiving them. He therefore suppressed all Forster's statement in the first interrogation.

The second interrogation took place at 2:20 p.m., fifty minutes after the first interrogation ended and about twenty minutes after Forster's first appearance in court. Judge Hopwood concluded that Forster made a knowing and intelligent waiver of his *Miranda* rights during this second interrogation, finding "most noteworthy" the intervening court proceeding before Judge Landry. Judge Hopwood found the court proceeding was a "focused, sobering event" for Forster. At that proceeding, Forster received a copy of the charges against him and was advised

---

19. *Id.* at 422, 106 S.Ct. at 1141; *see also Berghuis v. Thompkins*, 560 U.S. ——, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").

20. Obviously, if the impairment is substantial enough, it may be the controlling factor. *Cf. Garrett v. State*, 369 So.2d 833, 836 (Ala.1979) (discussing confession by mentally disabled juvenile).

21. *See, e.g., People v. Woidtke*, 224 Ill.App.3d 791, 167 Ill.Dec. 486, 587 N.E.2d 1101, 1111 (1992); *Commonwealth v. Cifizzari*, 19 Mass.App.Ct. 981, 474 N.E.2d 1174, 1177 (1985); *State v. Scott*, 841 S.W.2d 787, 789 (Mo.App.1992); *State v. Miller*, 714 S.W.2d 815, 818, 822–25 (Mo.App.1986); *McGregor v. State*, 885 P.2d 1366, 1378 (Okla.

Crim.App.1994); *Morris v. State*, 766 P.2d 1388, 1391–92 (Okla.Crim.App.1988).

22. *See, e.g., Commonwealth v. Hilton*, 443 Mass. 597, 823 N.E.2d 383, 392–93 (2005); *Commonwealth v. Cephas*, 361 Pa.Super. 160, 522 A.2d 63, 65 (1987).

23. *Woidtke*, 167 Ill.Dec. 486, 587 N.E.2d at 1111; *see also Hilton*, 823 N.E.2d at 393 (invalid waiver where defendant did not understand her legal rights); *Scott*, 841 S.W.2d at 789 (valid waiver where defendant understood that he could remain silent and that he was making a statement that could be used against him); *McGregor*, 885 P.2d at 1378 (valid waiver where defendant understood what he was doing when he made his statements); *Morris*, 766 P.2d at 1392 (valid waiver where defendant could understand and appreciate the rights that he waived); *Cephas*, 522 A.2d at 66 (invalid waiver where defendant was incapable of comprehending the meaning of the *Miranda* warnings at the time he was interrogated).

of the penalties he faced if he was convicted. He received detailed video advisements of his rights and a personal explanation from the judge—a much more detailed explanation than normally required for a *Miranda* waiver. Judge Landry also provided Forster with the necessary paperwork to request court-appointed counsel.

During the interrogation that followed that court appearance, Investigator Schied again advised Forster of his *Miranda* rights. Forster asked Schied to repeat some of the advisements, which Judge Hopwood found indicated that Forster was "actively thinking about his rights during the interview." After the advisements, when Schied asked Forster if he would mind talking to her, Forster responded: "I'd love to, I'd love to." And when Schied asked Forster about his next court date, he said, "I need to talk to you."

Judge Hopwood found that Forster then tried to explain the shooting in exculpatory terms, labeling it an accident. Judge Hopwood concluded that Forster "demonstrated an understanding of the situation and of his rights" that was "[m]arkedly different" from the first interrogation. He also found more generally that Forster was highly intelligent and had some experience with the criminal justice system. Judge Hopwood concluded that Forster's *Miranda* waiver was knowing and intelligent, and that Forster's statements were admissible.

■ Forster argues that there is no support in the record for Judge Hopwood's conclusion that his initial appearance before Judge Landry brought about such a change in his mental state that he was able to knowingly and intelligently waive his rights. He argues that the record is "replete with evidence of [his] continuing delusional state." In particular, he claims that his statements demonstrated that he was confused about whether his pastor could be his attorney. He argues that this confusion showed that his religious delusions undermined his ability

to knowingly and intelligently waive his *Miranda* rights.

This was the view that Forster's expert, Dr. LaGrande, advanced in superior court. She opined that Forster did not understand that his pastor could not act as his attorney and that this misunderstanding showed that he was incapable of assessing the meaning of his *Miranda* waiver.

But Judge Hopwood found that Dr. LaGrande misconstrued the record on this point. The judge found that Forster understood after the first court appearance that his pastor could not act as his attorney and that the court could appoint a licensed attorney for him. He also found that at the first court appearance Forster was not really asking to have his pastor act as his attorney—rather, he wanted his pastor to vouch for him.[24] Judge Hopwood's findings are a reasonable interpretation of the record, and Forster has not shown that these findings are clearly erroneous.[25]

Forster also argues that during the second interrogation he made statements demonstrating that he continued to suffer delusions. He notes, for instance, that he said his eyes were "bleeding" after Officer Watson allegedly sprayed him with pepper spray and that this bleeding was the "sweat of demons."[26] And Forster said he could not sleep in his jail cell because of the evil spirits there. He also points to evidence that late on the evening of December 26, after the second interview, he was observed "prancing around his cell, naked, yelling, groping at his genitals, drinking toilet water, and urinating around his cell."

■ Judge Hopwood recognized that Forster was still delusional to some degree. But a defendant's mental illness does not automatically preclude a knowing and intelligent waiver of rights; it is one factor courts must consider in the totality of the circumstances. Judge Hopwood's finding that Forster's thought processes became substantially more

---

**24.** At the first appearance, after Judge Landry asked Forster if he was going to have an attorney assist him, Forster said, "[I]nstead of having an attorney, I would like to have my—my pastor as my witness."

**25.** *See Nashoalook,* 663 P.2d at 979 n. 2.

**26.** It appears to be uncontested that Officer Watson's pepper spray was still snapped and secured on his belt after the incident.

rational during and after his court appearance is supported by the evidence.

Forster behaved rationally during his first court appearance. He gave the court his date of birth and the correct spelling of his name. After Judge Landry explained the charges and potential penalties, Forster asked the court to clarify one of the mandatory minimum sentences. He told Judge Landry he had no questions about the video advisements on his rights. And he objected to the amount of bail, asking the court why it had been increased from $150,000 to $500,000. He also strongly objected when Judge Landry imposed a condition of release barring him from any contact with his fiancée.

In the interrogation that followed the hearing, Forster was able to focus on Investigator Schied's questions about the events leading up to the shooting and to provide responsive answers. In general, he tried to explain the shooting in exculpatory terms, repeatedly labeling it an accident.

Judge Hopwood concluded that by the time of the second interrogation, Forster "understood what was at issue and what was at stake and he elected to talk with the police without an attorney." He rejected Dr. La-Grande's opinion that Forster's mental condition precluded a valid waiver, noting that her assessment was based in part on the legally irrelevant finding that Forster did not act in his best interests when he waived his *Miranda* rights.[27]

Judge Hopwood was not required to accept Dr. LaGrande's expert testimony, even though it was unrefuted, as long as there was a sufficient evidentiary basis for his contrary findings.[28] We conclude that Judge Hopwood did not err when he ruled that Forster made a valid waiver of his rights in the second interrogation.

We reach the same conclusion with respect to the third interrogation. Forster argues that his conduct in his cell the night before the third interrogation indicated that his mental condition was still poor. But Forster's conduct and statements during the interrogation itself support Judge Hopwood's ruling that he acted knowingly and intelligently. Although Forster at times complained that he was uncomfortable and tired, the record shows that he was calm and alert at the start of the interrogation when he waived his *Miranda* rights.

### Did the first interrogation taint Forster's subsequent waivers?

Forster next argues that Judge Hopwood should have suppressed his statements in the second, third, and fourth interrogations because his consent to those interrogations was tainted by the statements he made in the first interrogation, at a time when his mental state precluded a valid *Miranda* waiver. He argues that Judge Hopwood's ruling that the later waivers were valid was based on a faulty analysis and clearly erroneous findings.

As we explained in *Crawford v. State*,[29] there are two competing analyses of the potential curative effect of *Miranda* warnings administered to a suspect in custody after the police have already obtained an incriminating statement in violation of *Miranda.* The older, "dissipation of taint" analysis is based on the Supreme Court's decision in

---

**27.** *See Spring,* 479 U.S. at 576–77, 107 S.Ct. at 858–59 (citing *Moran,* 475 U.S. at 422, 106 S.Ct. at 1141) (for a *Miranda* waiver to be valid, police are not required to supply information that would merely affect the wisdom of the waiver); *State v. Kaahanui,* 69 Haw. 473, 747 P.2d 1276, 1281 (1987) (the *Miranda* rights waiver is calibrated "to ensure the voluntary and knowing nature of the waiver, not its ultimate wisdom"); *State v. Norfolk,* 221 Neb. 810, 381 N.W.2d 120, 127 (1986) ("In reference to a waiver of the rights designated in the *Miranda* warning, *intelligent* is not synonymous with *prudent,* and intelligence is not equated with wisdom.") (citation omitted); Wayne R. LaFave, Jerold H. Israel,

Nancy J. King, Orin S. Kerr, *Criminal Procedure* § 6.9(b) at 824 (3d ed.2007) ("it is not in the sense of shrewdness that *Miranda* speaks of intelligent waiver, and thus in this context intelligence is not equated with wisdom") (quoting *Collins v. Brierly,* 492 F.2d 735 (3d Cir.1974)) (internal quotation marks omitted).

**28.** *See Dolchok v. State,* 639 P.2d 277, 281 (Alaska 1982); *Trumbly v. State,* 515 P.2d 707, 708 (Alaska 1973); *cf. Bowker v. State,* 373 P.2d 500, 501–02 (Alaska 1962).

**29.** 100 P.3d 440 (Alaska App.2004).

*Brown v. Illinois.*[30] The Court more recently announced a modified analysis in *Oregon v. Elstad*,[31] which imposes a presumption that a second statement made after properly administered *Miranda* warnings is voluntary and admissible.[32] Alaska courts have not decided whether to adopt *Elstad* as a matter of state law.[33]

In *Crawford*, this court summarized the difference between these two tests:

> Under *Brown*, even though a suspect ultimately receives proper *Miranda* warnings, the statements that the suspect makes after receiving those *Miranda* warnings are still presumptively inadmissible; to rebut this presumption, the government must show that there was a "break in the chain of events" to insulate those later statements from the taint of the suspect's initial unwarned admissions. But under *Elstad*, ... "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the [earlier] unwarned statement inadmissible", even when there has been no significant break in the stream of events[.] [34]

In other words, *Elstad* raises a presumption that once *Miranda* warnings have been given, "the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" [35]

 Judge Hopwood concluded that the more rigorous *Brown* test was appropriate under the Alaska Constitution. We do not need to determine whether we should adopt *Elstad* as a matter of state law because we agree with Judge Hopwood's conclusion that Forster's second and subsequent interrogations pass the more rigorous *Brown* test. The intervening court appearance was a significant break in the chain of events insulat-ing Forster's later statements from the statements he gave in the first interrogation.

In *Halberg v. State*,[36] we listed several factors that courts should consider in assessing whether a defendant's subsequent statements should be deemed the tainted fruit of prior illegally obtained statements under the *Brown* test:

> [T]he purpose and flagrancy of the initial illegal act, the amount of time between the illegal act and the defendant's subsequent statement, the defendant's physical and mental condition at the time of the subsequent statement, whether the defendant remained in custody or was at liberty during this interval, whether the defendant had the opportunity to contact legal counsel or friends during this interval, whether the subsequent interview took place at a different location, whether the defendant's interrogators were the same officers who committed the prior illegal act, whether the evidence obtained from the prior illegal act affected the defendant's decision to submit to a subsequent interview, whether the police used lies or trickery to influence the defendant's decision, and whether there were other intervening events that affected the defendant's decision.[37]

Forster challenges Judge Hopwood's findings on several of these factors. First, he argues that Judge Hopwood erred in finding that the *Miranda* violation in the first interrogation was not flagrant. Forster argues that the violation was flagrant because Investigator Schied "persisted in interrogating Mr. Forster when he was obviously delusional and unable to focus, a fact easily discernible from the transcripts and observed without the benefit of a professional psychological assessment."

**30.** 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

**31.** 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

**32.** *Crawford*, 100 P.3d at 446–47.

**33.** *Stock v. State*, 191 P.3d 153, 156 (Alaska App. 2008); *Noyakuk v. State*, 127 P.3d 856, 863 (Alaska App.2006).

**34.** *Crawford*, 100 P.3d at 441 (quoting *Elstad*, 470 U.S. at 310–11, 105 S.Ct. at 1294) (alteration in *Crawford*).

**35.** *Elstad*, 470 U.S. at 311, 105 S.Ct. at 1294 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)).

**36.** 903 P.2d 1090 (Alaska App.1995).

**37.** *Id.* at 1098 (citations omitted).

But Judge Hopwood did not rely solely on the record of the first interrogation when he decided that Forster was incapable of knowingly and intelligently waiving his rights. The judge also relied on the evidence of Forster's unusual behavior in the days leading up to the shooting, his conduct when he arrived at jail on December 26, his statements to his friend Tubbs when Forster called him from jail, and the observations and conclusions of Dr. LaGrande. As Judge Hopwood emphasized, Investigator Schied did not have the benefit of all this information to assess whether Forster was malingering or instead suffering from such a severe mental illness that he was incapable of waiving his rights.

Forster also complains that Judge Hopwood failed to consider whether his illegally obtained admissions affected his decision to submit to later questioning. But Forster only mentions his admission that he shot Officer Watson, and that fact was never in dispute. Forster does not explain how this or any other admission affected his later decisions to waive his rights—he just makes the conclusory assertion that his admissions, together with his disturbed mental state, "put him at a psychological disadvantage."

During the first interrogation, Forster told Investigator Schied that Officer Watson got out of his patrol car with his gun drawn, backed him to the wall, told him to drop to his knees, and sprayed him in the eyes with pepper spray so he could not see. Forster said he took the gun from Watson's hand and, after a struggle over the gun, shot him in the heart and the head. Throughout the interview he maintained that he had no choice but to kill Watson: "I knew if I didn't shoot him he would pull his other gun and kill me," that "[h]e came after me and my bride," and that he "was going to kill me."

We have previously observed that "[a] defendant will not feel psychological pressure to waive his or her rights if the defendant does not view his or her prior statements as incriminating." [38] Several days later, concerned about new admissions he had made to

Investigator Schied during the third interrogation, Forster told Investigator Gilmore that "[t]he first story that I told [Schied] was what happened." Thus it appears unlikely that Forster considered that his statements in the first interrogation were incriminating.

Forster next argues that Judge Hopwood gave inadequate consideration to the fact that he remained in custody between the first and second interrogations and did not consult with a friend, his pastor, or a lawyer. Forster did, however, appear in court, and, as Judge Hopwood found, this was a significant intervening event. Forster watched detailed video advisements on his rights, he was informed of the charges against him, he was told that his pastor could not act as his attorney, and he was advised about his right to apply for court-appointed counsel. Judge Hopwood found that this hearing was a "focused, sobering" event for Forster, and this finding is supported by the more rational responses Forster provided to Investigator Schied's questions during the second interrogation.

As Judge Hopwood acknowledged, some of the *Brown* factors suggested that Forster's decision to waive his rights in the second interrogation was tainted by the earlier *Miranda* violation: the same officer conducted both interrogations, in the same place, and close in time. But these factors are relatively less significant, because Investigator Schied did not engage in any coercive or intimidating tactics during the first interrogation.[39] The totality of the circumstances therefore supports the superior court's conclusion that Forster's decision to waive his rights during the second interrogation was not tainted by the earlier *Miranda* violation.

Forster's claim also fails with respect to the third and fourth interrogations. Forster concedes that his mental condition had improved by this time. And Forster has not explained how his illegally obtained statements affected his decision to consent to these later interrogations.

Forster additionally argues that Investigator Schied did not scrupulously honor his

---

**38.** *Id.* at 1099 n. 4 (citing *United States v. Knight,* 395 F.2d 971, 975 (2nd Cir.1968)).

**39.** *Id.* at 1098.

right to silence during the third interrogation because she continued to question him after he said "I want some rest please." As the State points out, Forster did not raise this claim below, and we normally do not consider pretrial suppression issues raised for the first time on appeal unless the violation is "[s]ingularly egregious." [40] We find no egregious violation here. Forster cites no legal authority establishing that a reasonable police officer in the circumstances would understand his request for rest as an invocation of the right to silence[41] and there is authority to the contrary.[42]

### Did the troopers violate Forster's right to counsel?

■ Forster argues that the superior court should have suppressed all his statements in the interrogations following his first appearance before Judge Landry because his right to counsel under the Sixth Amendment and article I, section 11 of the Alaska Constitution attached at that hearing. He argues that his *Miranda* waivers were insufficient to waive his right to counsel.

Forster listened to a detailed video explanation of his right to counsel at his first appearance on December 26. The judge asked whether Forster was going to have the assistance of an attorney, and Forster indicated that he was not, that his pastor would act as his "witness." After the judge clarified that the pastor could not act as an attorney, Forster asked whether he was required to decide immediately. In response,

the judge gave Forster an application form he could use to request appointed counsel. Forster's second interrogation took place shortly after this court proceeding ended.

Judge Hopwood rejected Forster's Sixth Amendment claim with respect to this second interrogation on December 26 and the interrogations on December 27 and 28. He suppressed all of Forster's statements in the last interrogation on December 30, because Forster by then had filed the request for appointed counsel. Judge Hopwood did not address Forster's right to counsel under the Alaska Constitution because Forster did not raise that claim in superior court.

■ A defendant's initial appearance before a judge, at which the defendant is informed of the charges against him and bail is set, "marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." [43] Once that right attaches, the defendant is entitled to the presence of counsel at "any 'critical stage' of postattachment proceedings," [44] including a police interrogation.[45] However, in *Patterson v. Illinois*[46] the Supreme Court held that the *Miranda* warnings are sufficient to protect the Sixth Amendment right to counsel in the context of post-indictment questioning.[47]

Forster argues that *Patterson* does not apply in his case because Patterson initiated the police interview,[48] whereas Investigator Schied took Forster to a room in the court-

**40.** *See Moreau v. State,* 588 P.2d 275, 279–80 & n. 13 (Alaska 1978); *Longley v. State,* 776 P.2d 339, 343–44 (Alaska App.1989).

**41.** *See Munson v. State,* 123 P.3d 1042, 1048 (Alaska 2005) (citing *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)).

**42.** *See Berghuis,* 130 S.Ct. at 2259–60 (holding that an accused must unambiguously invoke the right to remain silent); *State v. Bailey,* 714 S.W.2d 590, 593 (Mo.App.1986) (holding a suspect's request for "some time to think alone" was not an invocation of the right to silence); *State v. Bey,* 112 N.J. 123, 548 A.2d 887, 892–93 (1988) (holding request to "lie down and 'think about what happened'" not a clear invocation of the right to silence); *State v. Domagalski,* 127 Wis.2d 563, 378 N.W.2d 297, 297 n. 7 (App.1985) (table, text in Westlaw, No. 85–509–CR) ("A person's

bare statement that he is tired and wants to sleep is not, without more, an invocation of his right to silence.").

**43.** *Rothgery v. Gillespie County, Texas,* 554 U.S. 191, 128 S.Ct. 2578, 2592, 171 L.Ed.2d 366 (2008).

**44.** *Id.,* 128 S.Ct. at 2591.

**45.** *Montejo v. Louisiana,* 556 U.S. ——, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009).

**46.** 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988).

**47.** *Id.* at 298–99, 108 S.Ct. at 2398.

**48.** *Id.* at 287–88, 108 S.Ct. at 2392.

house and interrogated him. But the Supreme Court has clarified that the *Patterson* analysis also applies when the police initiate the interview.[49] Thus, Forster's *Miranda* waivers were sufficient to waive his Sixth Amendment right to counsel.

Forster urges us to hold that a *Miranda* waiver is not adequate to waive the right to counsel under the Alaska Constitution. In other contexts, the Alaska Supreme Court has interpreted the right to counsel in article I, section 11 of the Alaska Constitution to afford greater protection to criminal defendants than the Sixth Amendment.[50] But Forster did not raise his state constitutional claim in superior court, so he must show plain error.[51] Judge Hopwood did not commit plain error by failing to adopt a more stringent test under the Alaska Constitution, given the clear Supreme Court precedent indicating that a valid *Miranda* waiver is sufficient to waive the Sixth Amendment right to counsel.[52]

### Was the judge required to impose a mandatory 99–year sentence?

Normally a person convicted of first-degree murder faces a sentencing range of 20 to 99 years to serve.[53] But AS 12.55.125(a)(1) provides that a defendant convicted of the first-degree murder of "a uniformed or otherwise clearly identified peace officer ... who was engaged in the performance of official duties at the time of the murder" is subject to a mandatory 99–year

term. Under related statutes, a defendant sentenced to this mandatory term is ineligible for a good-time deduction or discretionary parole.[54]

Forster was convicted of first-degree murder, and there was no dispute that Officer Watson was in uniform and engaged in official duties at the time he was killed. But the jury was never asked to make a finding that Officer Watson was a police officer engaged in official duties.

Under *Apprendi v. New Jersey*[55] and *Blakely v. Washington*,[56] a defendant's Sixth Amendment right to jury trial requires that any fact other than a prior conviction that increases the penalty for a crime "beyond the prescribed statutory maximum" must be submitted to a jury and proved beyond a reasonable doubt.[57] Judge Hopwood ruled that imposing the mandatory 99–year term would violate this rule because the jury did not find that Officer Watson was "engaged in the performance of official duties" at the time he was killed. He therefore applied the normal sentencing range of 20 to 99 years and imposed the maximum sentence within that range—99 years to serve, with no suspended time. That sentence left Forster eligible for both good-time credit and discretionary parole.

The State challenges this decision, arguing that eliminating a defendant's eligibility for discretionary parole or good time

---

**49.** *Montejo,* 129 S.Ct. at 2091.

**50.** *See Blue v. State,* 558 P.2d 636, 641–42 (Alaska 1977) (extending right to counsel to defendant subjected to pre-indictment lineup while in custody, absent exigent circumstances); *Alexander v. Anchorage,* 490 P.2d 910, 915 (Alaska 1971) (extending right to counsel to all criminal prosecutions involving the possibility of incarceration); *Roberts v. State,* 458 P.2d 340, 342–43 (Alaska 1969) (extending right to counsel to prisoner from whom the police sought to obtain a handwriting exemplar after indictment and appointment of counsel).

**51.** *See McGill v. State,* 18 P.3d 77, 81 (Alaska App.2001).

**52.** *See Marrone v. State,* 653 P.2d 672, 675–81 (Alaska App.1982) (when the applicable law can be reasonably disputed, there is no plain error).

**53.** AS 12.55.125(a).

**54.** *See former* AS 33.16.090(b) (2004) ("A prisoner sentenced to a mandatory 99–year–term under AS 12.55.125(a) ... is not eligible for discretionary parole during the entire term."); AS 33.20.010(a)(1) ("A prisoner is not eligible for a good time deduction if the prisoner has been sentenced to a ... mandatory 99–year term of imprisonment under AS 12.55.125(a)[.]").

**55.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**56.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

**57.** *Blakely,* 542 U.S. at 301, 124 S.Ct. at 2536 (quoting *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362–63).

does not affect the defendant's "statutory maximum" term for purposes of the rule in *Apprendi* and *Blakely*.

The State's argument is correct with respect to discretionary parole. In *State v. Malloy*,[58] the defendant challenged another subdivision of this statute, AS 12.55.125(a)(3), which requires a judge sentencing a defendant for first-degree murder to impose a mandatory 99–year term with no eligibility for parole if the judge finds by clear and convincing evidence that the defendant engaged in substantial physical torture of the victim. The Alaska Supreme Court held that this provision did not violate the right to jury trial in *Apprendi* and *Blakely* because, under AS 12.55.115, the sentencing court had the statutory authority to impose a 99–year sentence with no eligibility for discretionary parole even without a finding of substantial physical torture.[59] Therefore, the finding of substantial torture did not increase the "statutory maximum sentence."

Similarly, in the present case, a restriction on discretionary parole would not increase the statutory maximum sentence. There is no dispute that Forster's victim was a uniformed police officer engaged in his official duties. We therefore conclude that Judge Hopwood should have restricted Forster's eligibility for discretionary parole.

But the *Malloy* holding did not resolve whether the right to jury trial is violated by a sentence that denies the defendant the right to earn good-time credit based on a factual finding that was not submitted to the jury.[60] Under Alaska's good-time credit statutes, prisoners serve only two-thirds of their sentences and then are released on mandatory parole unless they forfeit good

time by misbehaving in prison.[61] But AS 33.20.010(a)(1) declares that a first-degree murder defendant who receives a mandatory 99–year term receives no good-time credit and therefore is never eligible for mandatory parole. The question left unresolved in *Malloy*—and squarely presented in this case—is whether a defendant is entitled to have a jury find the facts that result in this elimination of the good-time deduction.

The State argues that the weight of authority in other jurisdictions suggests that sentencing statutes restricting good-time credit do not implicate *Blakely* or *Apprendi* because the statutes do not alter the maximum sentence *imposed*, only the sentence *served*—and then only potentially, because the defendant might forfeit good-time credit by poor conduct in prison.[62]

Forster points out that Alaska sentencing courts have no authority to restrict eligibility for good-time credit. All first-degree murder defendants automatically receive the good-time deduction unless the State proves one of the factors listed in the statute—in this case, that the victim was an officer engaged in official duties.[63] Therefore, he argues, a mandatory 99–year sentence with no possibility of good-time credit and mandatory parole "is not within 'the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.' "

 The *Malloy* decision states the test we are required to apply to determine whether the good-time restriction increases the maximum sentence for purposes of *Apprendi*. This test is based on the original formulation by the United States Supreme Court in *Apprendi:* "[T]he relevant inquiry is one

**58.** 46 P.3d 949 (Alaska 2002) (*Malloy I*).

**59.** *Id.* at 954.

**60.** *See Malloy v. State*, 153 P.3d 1003, 1011 (Alaska App.2007) (*Malloy II*) (the restriction on good-time credit would have violated the ex post facto clauses of both the federal and state constitutions because Malloy committed her crimes before the amended statute took effect).

**61.** AS 33.20.040(a); *State v. Staael*, 807 P.2d 513 (Alaska App.1991).

**62.** *See, e.g., People v. Murphy*, 124 Cal.App.4th 859, 21 Cal.Rptr.3d 769, 772–73 (2004); *Jenner v. Ortiz*, 155 P.3d 563, 565 (Colo.App.2006); *People v. Robinson*, 383 Ill.App.3d 1065, 322 Ill.Dec. 792, 892 N.E.2d 39, 44 (2008); *People v. Fender*, 325 Ill.App.3d 168, 258 Ill.Dec. 956, 757 N.E.2d 645, 652–54 (2001); *State v. Montoya*, 137 N.M. 713, 114 P.3d 393, 397–98 (App.2005); *State v. Clark*, 205 Or.App. 338, 134 P.3d 1074, 1077–78 (2006); *State v. Spencer*, 128 Wash.App. 132, 114 P.3d 1222, 1228 (2005).

**63.** *See* AS 12.55.125(a)(1)-(5).

not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?"[64] We are required "to compare the harshest sentence actually available before a finding of aggravating circumstances under AS 12.55.125(a) with the actual harshness of the sentence that is mandated by such a finding."[65]

 This test involves three steps: first, we identify the harshest sentence available before a finding of the aggravating circumstance. Second, we identify the harshness of the sentence that is mandated when the aggravating circumstance is found. And third, we compare the two sentences to determine whether the aggravating circumstance requires a sentence that is "actually harsher" than the harshest sentence otherwise available.

 In this case, the harshest sentence available without a finding of the aggravating circumstance is 99 years' imprisonment, without the possibility of discretionary parole, but with a reduction for good-time credit. As we have noted, even without this aggravating circumstance, a sentencing judge has the statutory authority to restrict or completely eliminate a defendant's eligibility for discretionary parole.[66]

But the Alaska sentencing statutes give courts no discretion to limit a prisoner's good-time deduction.

 A prisoner sentenced to more than three days "is *entitled* to a deduction of one-third of the term of imprisonment."[67] The amount of the good-time deduction is computed according to a prisoner's total sentence and credited at the outset of the sentence.[68] At the expiration of the prisoner's sentence, less the time deducted for good conduct, the prisoner "shall be released."[69] A prisoner does not forfeit his good time unless the authorities establish that he has committed a subsequent offense or violated prison rules.[70] Thus a sentence of imprisonment necessarily includes good-time credit and mandatory parole, unless a fact finder makes one of the additional factual findings specified in the sentencing statute.[71]

The second step in the *Malloy* test requires us to identify the "actual harshness" of the sentence that is mandated by a finding of the aggravating circumstance. In this case, under AS 33.20.010(a)(1), a mandatory 99-year sentence calls for complete elimination of good-time credit and mandatory parole.

The third step requires us to compare the two sentences to determine whether the aggravating circumstance requires a sentence that is "actually harsher" than the harshest sentence otherwise available. Here, we must determine whether a sentence that excludes good-time credit is actually harsher than a sentence that includes good-time credit.

On a similar issue, the *Malloy* court stated that "a parole-restricted term of ninety-nine years is undeniably harsher than a ninety-nine-year term that does not restrict a defendant's eligibility for discretionary parole."[72] The court ultimately held that this distinction did not trigger the requirement of jury trial because a sentencing judge could restrict discretionary parole without relying on the aggravating circumstance. But the court's comparison of the parole-restricted sentence

**64.** *Malloy I*, 46 P.3d at 956 (quoting *Apprendi*, 530 U.S. at 494, 120 S.Ct. at 2365).

**65.** *Id.* at 956.

**66.** *Id.* at 954.

**67.** *Hampel v. State*, 911 P.2d 517, 521 (Alaska App.1996) (emphasis added) (quoting AS 33.20.010(a)).

**68.** *State v. McCallion*, 875 P.2d 93, 95, 98–99 (Alaska App.1994).

**69.** AS 33.20.030; *see Smith v. State, Dep't of Corrections*, 872 P.2d 1218, 1226–27 (Alaska 1994); *Hill v. State*, 22 P.3d 24, 27 (Alaska App.2001).

**70.** AS 33.20.050; *Briggs v. Donnelly*, 828 P.2d 1207, 1208–09 (Alaska App.1992).

**71.** *See* AS 12.55.125(a)(1)-(5) (mandatory 99-year sentence) & AS 33.20.010(a)(2)-(3) (making certain prisoners with multiple felony convictions ineligible for good time).

**72.** *Malloy I*, 46 P.3d at 956.

to a sentence without such a restriction bears directly on the issue presented in this case.

If a parole-restricted 99–year sentence is "undeniably harsher" than a sentence without such a restriction, then a sentence without the possibility of good-time credit and mandatory parole is "undeniably harsher" than a 99–year term without such a restriction. So the mandatory sentence required by the aggravating circumstance is "actually harsher" than "the harshest sentence actually available" without this finding: that is, the aggravating circumstance exposes the defendant to a greater punishment than the maximum sentence authorized by the jury's verdict standing alone.

 In *Keels v. United States* [73] the defendant challenged a similar statute that required the court to impose a sentence of life imprisonment without the possibility of parole for first-degree murder based on the court's finding of specified aggravating circumstances—for instance, that the murder was "especially heinous, atrocious, or cruel." [74] The *Keels* court concluded that this statute lengthened the maximum sentence the defendant faced, and rejected the government's claim that the limitation on parole was an increase in the mandatory minimum sentence that did not implicate the right to jury trial under *Apprendi:*

> Ultimately the government's distinction between a mandatory minimum and a maximum sentence in the present context is one of words. ... [Life without parole] is undeniably more burdensome to the defendant than life with the possibility of parole. ... Excluding the jury from the determination of an offender's eligibility for heightened punishment of this kind distorts *McMillan,* [75] a true mandatory minimum case, and cannot be reconciled with *Apprendi.* [76]

We agree with this reasoning and consequently hold that a sentencing court may not restrict or eliminate a defendant's eligibility for good-time credit and mandatory parole without holding a jury trial on the aggravating circumstance in AS 12.55.125(a).

In summary, Judge Hopwood correctly recognized that he could not restrict Forster's eligibility for good-time credit or mandatory parole based solely on the guilty verdict. Without additional findings, the most severe sentence the judge could impose was 99 years subject to the normal good-time deduction of one-third of that sentence. *Apprendi* and *Blakely* require that any finding eliminating this good-time deduction be submitted to a jury and proven beyond a reasonable doubt.

But Judge Hopwood was required to impose the restriction on discretionary parole mandated by AS 12.55.125(a). This restriction does not increase the statutory maximum sentence, so a jury finding is not required. [77] In this case, there is no dispute that the victim of Forster's crime was a uniformed peace officer who was engaged in the performance of his official duties at the time of this crime.

 Under the double jeopardy clauses of the state and federal constitutions, "once a sentence has been meaningfully imposed, it may not, at a later time, be increased." [78] But an illegal sentence may be corrected even if this means increasing the sentence because an illegal sentence has not been "meaningfully imposed" for double jeopardy purposes. [79] The superior court's decision not to restrict Forster's discretionary parole constituted an illegal sentence because, as just noted, the parole restriction was required by the uncontested facts of this case.

**73.** 785 A.2d 672 (D.C.2001).

**74.** *Id.* at 680.

**75.** *See McMillan v. Pennsylvania,* 477 U.S. 79, 81–82, 93, 106 S.Ct. 2411, 2413–14, 2420, 91 L.Ed.2d 67 (1986) (holding it permissible to increase a mandatory minimum sentence based solely on facts found by the sentencing judge).

**76.** *Keels,* 785 A.2d at 684 (citation omitted).

**77.** *Malloy I,* 46 P.3d at 957.

**78.** *Lapp v. State,* 220 P.3d 534, 537 (Alaska App. 2009) (citing *Sonnier v. State,* 483 P.2d 1003, 1005 (Alaska 1971)).

**79.** *Smith v. State,* 892 P.2d 202, 203 (Alaska App.1995).

Forster argues that the State cannot challenge the legality of his sentence in a cross-appeal, but only in a petition for review. He also argues that the State's cross-appeal should not be treated as a petition for review.

There is authority holding that the State may only seek modification of an illegal sentence by filing a petition for review.[80] But those cases were decided before the legislature amended this court's jurisdictional statute, AS 22.07.020, in 1993 to broaden the State's right to appeal in criminal cases. Before that amendment, the State's right to appeal in criminal cases was limited to testing the sufficiency of the indictment or information.[81] Under the current statute, the government's right to appeal is limited only by "the prohibitions against double jeopardy contained in the United States Constitution and the Alaska Constitution."[82] As we have already discussed, correcting an illegal sentence does not violate the defendant's right against double jeopardy.

When the legislature amended AS 22.07.020(d)(2), it declared its intent to bring the State's right to appeal in criminal cases in line with federal law under 18 U.S.C. § 3731.[83] And yet the federal courts of appeal are split on whether section 3731 authorizes the government to appeal an illegal sentence,[84] and the legislative history of AS 22.07.020(d)(2) is silent on this issue.[85] It is therefore not clear whether the State has a right to pursue a modification of Forster's sentence in a cross-appeal.

As Forster points out, if the State appeals a criminal sentence as too lenient and the defendant does not challenge the sentence, under AS 12.55.120(b) the authority of this court is limited to issuing an advisory opinion approving or disapproving the sentence.[86] But the plain language of this statute suggests that it limits only our authority to modify a sentence the State challenges as too "lenient"—i.e., as an abuse of discretion.[87] Alaska cases have long recognized our authority to direct sentencing courts to correct an illegal sentence,[88] and nothing in the legislature's 1993 amendment to our jurisdictional statute suggests it intended to change this well-established rule.[89]

We need not definitively resolve these questions because we conclude that the State's appeal raises an important question of law that advances an important public interest and that it merits recognition as a petition for review.[90] The superior court's decision not to restrict Forster's discretion-

**80.** *See Napayonak v. State*, 793 P.2d 1059, 1063 (Alaska App.1990); *State v. LaPorte*, 672 P.2d 466, 468–69 (Alaska App.1983).

**81.** Ch. 71, § 2, SLA 1993; *see State v. Walker*, 887 P.2d 971, 975–76 (Alaska App.1994). As discussed later in the text of this opinion, both before and after 1993, the State also had the right to appeal a sentence as too lenient. *See former* AS 22.07.020(d)(2) (pre–1993 version); AS 12.55.120(b).

**82.** AS 22.07.020(d)(2).

**83.** Ch. 71, § 1, SLA 1993; *see also* Committee Minutes, House Judiciary Committee discussion of H.B. 181 (March 8, 1993).

**84.** *Compare United States v. Edmonson*, 792 F.2d 1492, 1496–97 (9th Cir.1986), *with United States v. Denson*, 588 F.2d 1112, 1125–27 (5th Cir. 1979), *modified on rehearing en banc*, 603 F.2d 1143 (5th Cir.1979); *see also United States v. Horak*, 833 F.2d 1235, 1246–48 (7th Cir.1987) (discussing this split in authority, and holding that 18 U.S.C. § 3731 did not authorize appeals from sentencing decisions).

**85.** *See* Ch. 71, §§ 1–5, SLA 1993; Minutes of House Judiciary Committee, House Bill 181,

(March 8, 1993); *see also* House Judiciary Committee file on H.B. 181 (sponsor statement, fiscal note, and Division of Legal Services sectional summary).

**86.** AS 12.55.120(b); AS 22.07.020(b).

**87.** *See State v. Gibson*, 543 P.2d 406, 408 (Alaska 1975), *overruled on other grounds by State v. Dunlop*, 721 P.2d 604 (Alaska 1986).

**88.** *See State v. Occhipinti*, 562 P.2d 348, 349 (Alaska 1977); *Dunham v. City and Borough of Juneau*, 790 P.2d 239, 241 (Alaska App.1990), *receded from on other grounds in Curtis v. State*, 831 P.2d 359, 360–61 (Alaska App.1992); *LaPorte*, 672 P.2d at 468–69 & n. 6.

**89.** The legislature explicitly retained the limitation on our authority to modify a sentence the State appealed as too "lenient" when it otherwise broadened the State's right to appeal in criminal cases in 1993. *See* Ch. 71, § 4, SLA 1993; AS 12.55.120(b).

**90.** *See* Alaska Appellate Rule 402(b)(2).

ary parole constituted an illegal sentence because the parole restriction was required by the uncontested facts of this case. We therefore grant the petition for review and reverse the superior court's decision on this issue.

### *Is discretionary parole required by Forster's right to reformation?*

Forster also argues that a 99–year term of imprisonment without discretionary parole would violate his right to reformation. Article 1, section 12 of the Alaska Constitution provides in pertinent part:

> Criminal administration shall be based upon the following: the need for protecting the public, community condemnation of the offender, the rights of victims of crimes, restitution from the offender, and the principle of reformation.

This provision provides an outer limit on the legislature's authority to determine the appropriate punishment for a crime.[91]

A given sentencing provision is not required to satisfy each of the goals listed in this provision.[92] The legislature may reasonably emphasize certain goals over others when determining the individual components of a criminal sentence.[93] In other words, each component of a criminal sentence must advance the protection of the public, community condemnation of the offender, the rights of crime victims, restitution, or the reformation of the defendant.

We therefore consider which of these goals might be served by the legislative restriction on discretionary parole for a defendant who intentionally killed a police officer. The legislature could reasonably conclude that a restriction on parole might be necessary to protect the public from someone brazen and dangerous enough to murder a uniformed police officer engaged in official duties. The legislature could likewise conclude that this crime merited additional community condemnation because of the officer's special role in maintaining public order, and because of the risks police officers take by putting themselves in harm's way. The legislature could also conclude that a lengthy sentence is necessary for a person who murders a police officer in order to deter the offender from future crimes and to serve as a warning to others. The restriction on discretionary parole for these serious offenders thus bears a substantial relationship to several of the sentencing goals.

Forster argues that we recognized the importance of the three-judge panel as a safety valve when we sustained the presumptive sentencing system against a similar constitutional attack.[94] The three-judge panel has the authority to depart from the strict provisions of the presumptive sentencing scheme to prevent "manifest injustice." [95] The three-judge panel has no authority in a first-degree murder case, like this one, because presumptive sentencing does not apply.

But a defendant sentenced to a mandatory 99–year term does have a different type of safety valve. A defendant sentenced to a mandatory 99–year term under AS 12.55.125(a) may apply for a modification or reduction of sentence after serving one-half the mandatory term without consideration of good time.[96] This provision serves the goal of reformation for those offenders who deserve parole consideration before their mandatory release.

In this case, Judge Hopwood recognized that Forster had a low potential for rehabilitation. If his circumstances change during his incarceration, then he may be eligible for a sentence modification and discretionary parole. But regardless of Forster's future

---

91. *See Nell v. State*, 642 P.2d 1361, 1368–69 (Alaska App.1982) (citing *Thessen v. State*, 508 P.2d 1192, 1197 (Alaska 1973) *overruled on other grounds by Dunlop*, 721 P.2d at 610).

92. *See Koteles v. State*, 660 P.2d 1199, 1202 (Alaska App.1983) (Singleton, J., concurring) (describing the discussion of this provision at the Alaska Constitutional Convention, including the interpretation of the similar language of the Indiana Constitution).

93. *See Dancer v. State*, 715 P.2d 1174, 1182 (Alaska App.1986) (citing *Koteles*, 660 P.2d at 1202–03 (Singleton, J., concurring)).

94. *See id.* at 1177–79.

95. AS 12.55.175.

96. AS 12.55.125(j).

potential, we conclude that the statutory restriction on his discretionary parole is consistent with the multiple sentencing goals encompassed in the Alaska Constitution.

### Conclusion

We find no error in the superior court's denial of Forster's motion to suppress. We therefore AFFIRM the judgment of conviction. But we REMAND for amendment of the judgment to reflect that Forster is not eligible for discretionary parole.