**Thomas S. MILLMAN, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–4138.**

Court of Appeals of Alaska.

Nov. 13, 1992.

---

Walter W. Mason, Jamin, Ebell, Bolger, & Gentry, Seattle, for appellant.

Peter C. Gamache, Dist. Atty., Kodiak, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

The Alaska Department of Fish and Game regulates the taking of crab by dividing the state's waters into various areas. Vessels fishing for crab must register for particular areas and particular types of crab; once registered, vessels are authorized to take crab only within their specified areas. 5 AAC 34.020 (governing king crab); 5 AAC 35.020 (tanner crab).

Normally, a vessel that has caught king crab must not take the unprocessed crab outside the vessel's registration area, 5 AAC 34.090(a), and must land the crab (i.e., off-load the crab for sale) within its registration area. 5 AAC 34.030(c). A vessel may land the crab in another registration area only if the vessel complies with 5 AAC 34.030(d)–(e):

(d) [The vessel] must contact by radio a local representative of the department [of Fish and Game] prior to leaving the statistical area encompassing the [registration] area for which the vessel is registered, and shall submit to ... inspection [if the department requires]. The [department] representative contacted by the vessel must be located in the registration area for which the vessel is validly registered at the time....

(e) A vessel making radio contact pursuant to (d) of this section shall state to the local representative of the department the amount of king crab on board at the time.

When a vessel secures permission to land king crab at a location outside its registration area, the amount of crab landed must comport with the amount of crab the vessel had when it left the registration area. If the department exercises its power under 5 AAC 34.030(d) to board and inspect the vessel, then the amount of crab ultimately landed must be no greater than the amount of crab observed during the inspection. 5 AAC 34.030(d). If the department foregoes physical inspection and allows the vessel to simply report its catch under 34.-030(e), then the amount of crab landed cannot vary more than ten percent from the amount of crab reported to the department representative under section 030(e). 5 AAC 34.097.

In November and December of 1988, Millman participated in the Adak area commercial crab fishery. Wishing to land the crab in Kodiak (outside the Adak registration area), Millman brought his boat to port in Dutch Harbor on December 5, 1988 and telephoned Fish and Game biologist Kenneth Griffin (the department representative in Dutch Harbor) to report the amount of king and tanner crab Millman had aboard his vessel. Even though 5 AAC 34.030(d) states that a vessel must contact the department representative "by radio", Griffin testified that he routinely accepted vessels' reports of their crab catches by both radio and telephone.

Millman told Griffin that his vessel contained 1300 king crab. Eight days later, on December 13, Millman delivered his crab to All–Alaskan Seafoods in Kodiak. Debra Sundberg, a company employee, filled out a fish ticket recording the amount of king crab that Millman had landed. Millman delivered 3398 king crab to All–Alaskan Seafoods, 2098 more than he had reported to Griffin.

Millman was charged with violating 5 AAC 34.097, the regulation that prohibits any variance of ten percent or greater between the amount of crab reported under 5 AAC 34.030(e) and the amount of crab ultimately landed. Following a bench trial in the Kodiak district court, Millman was convicted.

The district court fined Millman $3000, of which $1500 was suspended, and also imposed a forfeiture of over $93,000. Millman appeals his conviction, contending both that the district court should have granted him a judgement of acquittal and that the court should have dismissed the prosecution because of the State's delay in bringing the charge. Millman also challenges the forfeiture imposed on him by the district court. We affirm Millman's conviction, but we modify the amount of the forfeiture.

At the conclusion of Millman's trial, he moved for a judgement of acquittal. The regulation Millman was charged with violating—5 AAC 34.097—prohibits a ten-percent variance between the amount of crab landed and the amount of crab reported to the department representative under 5 AAC 34.030(e). Millman pointed out that 5 AAC 34.030(e) apparently requires a vessel to report the amount of its catch only if the vessel makes "radio contact" with the department's local representative. Millman argued that, because he had contacted Griffin by telephone rather than by radio, Millman's report of his catch had not been made under 5 AAC 34.030(e). Thus, according to Millman, he could not possibly have violated 5 AAC 34.097.

We reject Millman's reading of 5 AAC 34.030(e). Even though the regulation refers to reports made by radio, it must be read to encompass reports made by telephone. As explained above, the Department of Fish and Game has attempted to regulate and maintain Alaska's crab fishery by dividing the state's waters into registration areas and restricting a vessel's crab operations to specific areas. Not only must a vessel restrict its crab operations to specified registration areas, but it is illegal for a fishing vessel even to possess unprocessed crab outside its registration area unless that vessel has secured prior approval under 5 AAC 34.030(d)–(e) to transport its catch to a seafood processor outside the registration area. 5 AAC 34.-090(a).

This regulatory framework clarifies the purpose behind section 34.030(e)'s requirement that a vessel must render a strict account of its catch before leaving the registration area. A vessel that has obtained the department's permission to leave the registration area with unprocessed crab on board (ostensibly to deliver its catch to an out-of-area processor) must not be permitted to continue to take crab outside its specified area of operations. To prevent this abuse, 5 AAC 34.097 requires that the amount of crab ultimately sold by the vessel must agree (within a ten-percent tolerance) with the amount of crab declared by the vessel when it left its specified fishing area. For this purpose, it is irrelevant whether the skipper reports the catch by radio, or whether the vessel comes to port and the skipper makes the report by telephone (as Millman did), or, indeed, whether the skipper comes to the department office and makes the report in person.

As the trial judge pointed out, the regulations' reference to "radio contact" appears to serve two functions. First, a vessel is allowed to remain at sea rather than come to port to report its catch and request permission to leave the registration area. Second, the local representative can be away from the office, on the water or in the field, and still receive the vessel's report. In the present case, however, Millman chose to bring his vessel to port in Dutch Harbor and to use a telephone to contact the resident department representative. The local representative, Griffin, was present in his office to receive Millman's call, and he chose to accept Millman's telephone report rather than hew to the strict language of 34.030(d) by ordering Millman to return to his vessel to make his report by radio.

Millman does not argue that, under these circumstances, there is any rational distinction to be drawn between radio reports and telephone reports. He nonetheless contends that, because 34.030(e) clearly specifies "radio" contact, a skipper cannot be punished for a later non-conforming sale of crab unless the original report of the catch was made by radio. Millman argues that, when the wording of a statute or regulation is so clear, a court cannot redraft the

statute even when the legislature's (or agency's) choice may have been unwise or even irrational. *Copelin v. State,* 659 P.2d 1206, 1211 (Alaska 1983); *Belarde v. Anchorage,* 634 P.2d 567, 568 (Alaska App. 1981).

We agree with Millman that it is not a court's function to rewrite bad statutes. However, we reject Millman's argument that a court can do nothing when a statute's wording is "plain". The guiding principle of statutory construction is to ascertain and implement the intent of the legislature or agency that promulgated the statute or regulation. Identifying the "plain meaning" of a word or phrase used in a regulation does not end the process of statutory construction:

> Once the "plain meaning" of a term is determined, however, the court should not apply it mechanically. *Alaska Public Employees Assn. v. Fairbanks,* 753 P.2d 725, 727 (Alaska 1988). Instead, the court uses a sliding scale approach to statutory interpretation in which it also considers the legislative history of the statute and whether the history reveals a legislative intent and meaning that is contrary to the plain meaning.

*Stephan v. State,* 810 P.2d 564, 566 (Alaska App.1991).

When a statute or regulation is part of a larger framework or regulatory scheme, even a seemingly unambiguous statute must be interpreted in light of the other portions of the regulatory whole. *Lake v. Construction Machinery, Inc.,* 787 P.2d 1027, 1030 (Alaska 1990); *Hafling v. Inlandboatmen's Union of the Pacific,* 585 P.2d 870 (Alaska 1978); *Hotel, Motel, Restaurant, Construction Camp Employees & Bartenders Union, Local 879 v. Thomas,* 551 P.2d 942 (Alaska 1976). As noted earlier in this opinion, 5 AAC 34.030(d)–(e) are indeed part of a larger regulatory framework that maintains and preserves Alaska's crab resources by restricting the operations of fishing vessels. The regulatory requirement that a vessel report its catch is designed to insure that a vessel does not continue to take crab after it has been granted permission to land its catch outside its registration area.

Local representative Griffin's acceptance of Millman's telephone report was a common-sense and reasonable approach to the problem posed by Millman's non-compliance with the strict "radio" language of subsections (d) and (e) of the regulation. When the department's local representative receives a vessel's report by telephone, it would appear that all regulatory concerns of the department are satisfied. Notably, the testimony presented in this case shows that, when the department receives a telephone report of a vessel's catch, the department views the telephone report as compliance with 34.030(d)–(e). When the construction of a regulation presents a question of law involving an area of agency expertise or policy-making responsibility, courts will defer to the agency's construction of the regulation. *Alaska Public Employees' Assn. v. State,* 831 P.2d 1245, 1247 (Alaska 1992); *Homer Electric Assn. Inc. v. City of Kenai,* 816 P.2d 182, 184 n. 10 (Alaska 1991); *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987). Here, we must defer to the Department of Fish and Game's willingness to accept a telephone report as compliance with the regulatory requirement.

Adoption of Millman's view of the regulation would lead to absurd consequences. A local department representative like Griffin who received a telephone report of a vessel's catch would have to tell the skipper to re-board his vessel and make the same report by radio, else the department would forfeit its right to insist that the reported catch conform to the vessel's later delivery of crab at the processor. Moreover, under Millman's construction of the law, Millman would himself be guilty of violating 5 AAC 34.030(d), because his telephone call to the local department representative did not constitute "contact by radio". This, in turn, would mean that Millman's subsequent act of taking the unprocessed crab out of the registration area and landing his catch in Kodiak would violate 5 AAC 34.090(a), because Millman would not have been acting "pursuant to the authori-

zation of 5 AAC 34.030(d)". We find it inconceivable that the law would support prosecution of a skipper who accurately reported his or her catch but who made the report by telephone instead of radio.

When the department's local representative receives a vessel's report by telephone, punctilious observance of a distinction between a radio report and a telephone report serves no purpose, either for the department or for the skipper of the vessel. Indeed, such close adherence to the strict wording of the regulation would actually impede the functioning of the regulatory scheme. Even though criminal statutes generally must be construed in favor of the accused, a court is nevertheless obliged to avoid construing statutes in a way that leads to patently absurd results or to defeat of the obvious legislative purpose behind the statute. *Sherman v. Holiday Construction Co.*, 435 P.2d 16 (Alaska 1967); *Wylie v. State*, 797 P.2d 651, 657 (Alaska App.1990); *Belarde*, 634 P.2d at 568.

We therefore conclude that, although 5 AAC 34.030(d) and 030(e) specify that a vessel shall make its report to the department's local representative by "radio", the regulations are satisfied when the department's local representative receives the vessel's report by telephone. A report received by telephone is equivalent to a report received by radio for purposes of determining whether the vessel's reported catch conforms to the delivered catch under 5 AAC 34.097.

■ Millman advances one additional argument. He notes that the district court denied his motion for judgement of acquittal on other grounds; in fact, the district court explicitly rejected the argument that 5 AAC 34.030(d)–(e) could be construed to encompass telephone reports as well as radio reports. Millman asserts that the State is therefore precluded from arguing that the district court's ruling should be upheld under the reasoning contained in this opinion; he argues that the district court's strict construction of the regulation must be considered the law of the case.

Because it is within the special competence of an appellate court to interpret statutes, this court need not defer to the district court's interpretation of the regulations at issue in this appeal. *Conner v. State*, 696 P.2d 680 (Alaska App.1985). Moreover, an appellee can defend a trial court's decision on any legal theory supported by the record. *Russell v. Anchorage*, 626 P.2d 586, 588 n. 4 (Alaska App. 1981). This rule applies not only to legal theories that went unvoiced in the trial court, but even to theories that were explicitly rejected by the trial court. See *Ransom v. Haner*, 362 P.2d 282, 285 (Alaska 1961), where a trial court's evidentiary ruling was upheld on appeal under a legal theory that the trial court had rejected. This court is therefore authorized to rely upon our construction of 5 AAC 34.030(d)–(e) to uphold the district court's decision, even though the district court considered and rejected this same construction of the regulations.

■ Millman raises a second attack on his conviction, arguing that the State's delay in filing the charges against him violated his constitutional right to due process. Millman delivered his non-conforming crab catch to the seafood processor in Kodiak on December 13, 1988; the State did not file charges against him until February 5, 1991. The district court found that this 26–month delay was unreasonable, but the court denied Millman's motion to dismiss because Millman had failed to show that he had been prejudiced by this delay.

The due process clauses of the United States and the Alaska Constitutions protect the accused against unreasonable pre-accusation delay.[1] *See United States v. Marion*, 404 U.S. 307, 324; 92 S.Ct. 455, 465; 30 L.Ed.2d 468 (1971); *State v. Mouser*, 806 P.2d 330, 336 (Alaska App.1991). But to prevail on a claim of pre-accusation delay, the accused must establish both that the delay was unreasonable and that it actually prejudiced the accused's defense of the case; a showing of potential or possible prejudice will not suffice.

1. United States Constitution, Fourteenth Amend-ment; Alaska Constitution, Art. I § 7.

By actual prejudice we mean a particularized showing that the unexcused delay was likely to have a specific and substantial adverse impact on the outcome of the case. ... [T]he generalized prospect of ... lost witnesses does not amount to actual prejudice.... At the very least, the accused must show that[,] but for the delay, he would have been able to present favorable evidence. Mere speculation about the loss of favorable evidence is insufficient.

*Mouser*, 806 P.2d at 337–38 (quotations and citations omitted).

■ Millman's sole claim of prejudice concerns the potential testimony of Debra Sundberg, the All–Alaskan Seafoods employee who filled out the fish tickets with the amount of crab Millman presented for processing in Kodiak. (A seafood processor receiving seafood from a vessel must fill out fish tickets that accurately record the amount of the delivered catch. 5 AAC 34.096.)

Sundberg did not testify at trial, having left the Kodiak area before the start of the proceedings. Millman claims that Sundberg would have presented "potentially exculpatory information" at trial regarding the accuracy of the fish tickets. Millman maintains that the accuracy of the fish tickets was called into question at trial because the fish tickets contained, in addition to the information recorded by Sundberg, notations written by other people. Millman also contends there was some confusion at trial over the type of crab recorded on each fish ticket.

Millman has failed to specify precisely how Sundberg's testimony would have established that the fish tickets were in error. As noted above, 5 AAC 34.096 requires the processor to accurately describe the quantity of crab presented by the vessel. Moreover, since the quantity of crab determines how much money the processor will pay to a crab fisherman, it is reasonable to assume that Millman took some interest in the accuracy of Sundberg's notations when she filled in the fish ticket. The district court admitted the fish tickets into evidence at trial, and Millman does not challenge this ruling on appeal.

Millman's conclusory allegation that Sundberg might potentially have "exculpatory information" hardly qualifies as the "particularized showing" of "specific and substantial" prejudice required by *Mouser*. Accordingly, we find no error.

■ Millman challenges the forfeiture imposed by the district court. The court ordered Millman to pay the market value of the difference between the amount of crab he landed at All–Alaskan Seafoods and the smaller amount of crab he reported to Griffin before he left Dutch Harbor. Millman points out that AS 16.05.722(b) requires forfeiture "of any fish, or its fair market value, *taken* or *retained* as a result of the commission" of a commercial fishing violation. Millman argues that his offense did not involve the illegal taking or retention of crab, but only the underreporting of his catch.

We disagree. Millman was convicted of violating 5 AAC 34.097, which prohibits "any vessel acting pursuant to the authority of 5 AAC 34.030(d) to land an amount of king crab 10 percent greater ... than the amount stated under 5 AAC 34.030(e)." The offense is committed, not by making a false report, but by the act of landing a non-conforming quantity of crab. When Millman presented these extra crab to the processor, this extra portion of his catch, or its equivalent value in money that Millman received from the processor, was "retained as a result of the commission of the violation." It was therefore subject to forfeiture.

■ Millman further faults the district court for ordering forfeiture in the amount of $93,151.20. The district court arrived at this figure by subtracting the number of king crab Millman reported when he left Dutch Harbor (1300) from the number of king crab he later presented to the processor in Kodiak (3398), then multiplying this difference (2098) by the average weight of the crab on Millman's vessel (8 lbs.) and by the market price the processor paid for the crab ($5.55 per lb.).

Millman argues that this $93,151.20 was not all profit. He asserts that he was only a fifty-percent shareholder of the company that owned the vessel, and that, by the time his expenses for fuel, food, and bait are considered, his actual profit was no more than $30,465.00.

AS 16.05.022(b) specifies that the sentencing court shall order forfeiture of the fair market value of the illegal catch. The statute makes no provision for offsetting this fair market value with the violator's operating costs. We believe that the legislature is free to impose a forfeiture that reflects the loss to the state's resource rather than the amount of profit ultimately reaped by the violator.

■ Millman also claims the forfeiture order must be vacated because the district court did not issue the order until approximately thirty-two months after the commission of the violations. He argues that it is unfair to order a forfeiture when the proceeds from the illegal catch have long ago been spent. Millman has cited no authority establishing that a forfeiture order must be imposed within a certain period of time after the commission of the offense. The case he relies on, *United States v. Eight Thousand Eight Hundred and Fifty Dollars in United States Currency*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983), is not on point; that case involved a delay in the institution of civil forfeiture proceedings, akin to Millman's pre-accusation delay argument that we have already rejected.

Given our conclusion that Millman's prosecution was not barred by the State's delay in bringing charges, and because the additional time between the filing of charges and the imposition of the forfeiture was due entirely to the normal demands of adjudicating those charges, we find no legal impediment to the district court's imposition of the forfeiture.

■ We do, however, believe that the district court's forfeiture order must be modified. The district court arrived at the amount of forfeiture by calculating the fair market value of 2098 crab; this figure of 2098 crab represented the number of crab Millman delivered (3398) minus the number of crab he reported (1300). However, under 5 AAC 34.097, the quantity of illegal crab was the difference between the amount delivered and the amount reported, adjusted upward by ten percent. Thus, the district court should have based its calculations on an illegal landing of 1968 crab [3398 − (1300 + 130)]. Using the same figures for the average weight of the crab and their market value, the forfeiture should have equaled $87,379.20.

With this modification, the judgment of the district court is AFFIRMED.