Bruce DICKIE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10670.

Court of Appeals of Alaska.

July 27, 2012.

Josie Garton, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Tamara E. de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

BOLGER, Judge.

Bruce Dickie appeals his conviction for first-degree stalking of a family in Anchorage. Dickie contends that the State's evidence was legally insufficient to prove that his repeated contacts with the family were "nonconsensual" within the meaning of AS 11.41.270(b)(3)—*i.e.,* that these contacts were "initiated or continued without [the family's]

consent, . . . or . . . in disregard of [the family's] expressed desire that the contact[s] be avoided or discontinued." In particular, Dickie argues that the State's evidence in this case was insufficient to prove that he knew that his contacts with the family were contrary to their wishes. We conclude that the State's evidence, viewed in the light most favorable to the jury's verdict, was sufficient to establish this element of the offense.

Dickie also argues that the statutory definition of "nonconsensual" is unconstitutionally broad unless we require the State to prove that the unwanted contacts were accompanied by some degree of coercion or force. For the reasons explained in this opinion, we reject this contention.

In a separate claim, Dickie argues that the superior court committed plain error by failing to instruct the jury on the definition of "victim" under the stalking statute. Dickie contends that, without this statutory definition, the jury might have convicted him of stalking even though they believed Dickie's proposed defense—*i.e.*, even though the jurors concluded that Dickie was not targeting the family who lived at the residence, but was instead making good-faith but misguided efforts to contact someone else who he mistakenly believed lived in that residence.

We conclude that, given the instructions that the jury did receive, and given the final arguments of the parties, there was no risk that the jurors misunderstood Dickie's proposed defense. Accordingly, the superior court's failure to give the jurors a more technical definition of "victim" was not plain error.

### Background

The Petersen family resided in a duplex in Anchorage. In May 2009, the Petersens' eighteen-year-old daughter saw Dickie walking around their house at approximately 9:30 p.m., holding a bag of beer. A short time later, Dickie knocked on the door and asked for someone named Sherry Anson. The daughter informed Dickie that Sherry Anson did not live at that residence. Dickie then left.

About two weeks later, the Petersens found a pizza on their front porch. Another week later, someone left two Starbucks coffee drinks and a bag of deli food from Fred Meyer on the porch. At the end of May, the family left town for Memorial Day weekend and returned to find a can of Pringles potato chips on their porch.

On June 1, the Petersens observed Dickie return to the house and leave another bag of Fred Meyer deli food on the porch. Mr. Petersen was able to stop Dickie in the driveway and ask why he was leaving the food. Dickie stated that he thought his friend, Sherry Anson, lived at the house. Dickie said his name was Bruce, but gave a false last name.

Mr. Petersen informed Dickie that he was scaring his family and that he believed Dickie was stalking them. Mr. Petersen said he would call the police if Dickie returned to their home. Mr. Petersen wrote down Dickie's license plate number as he drove away.

On June 8, Ms. Petersen was watching a movie when she saw Dickie enter their yard from the woods behind their duplex. Dickie was swaying and appeared to be drunk. Mr. Petersen herded his family upstairs into a bedroom, while Ms. Petersen called 911 on her cell phone. Dickie was crouched down in the yard and holding "a big, silver gun." He eventually got up and walked out of the yard through a wooded area.

Anchorage police responded to the 911 dispatch and went to Dickie's home, a short distance from the Petersens' duplex. Dickie was slurring his speech and had an odor of alcohol about him. Anchorage Police Officer Jonathan Gould performed a field sobriety test that led him to believe Dickie was intoxicated.

Police found two guns and several magazines of ammunition in Dickie's pants. One of the guns was a Para–Ordnance that had a round of ammunition in the chamber and rounds of ammunition in the magazine. The second gun, a nine-millimeter Beretta, contained rounds in the magazine. Police also found "a very large" loaded Smith and Wesson revolver on Dickie's couch. Police located three other guns—a loaded .44 Ruger

handgun, a 30.06 rifle, and a Blissfield shotgun—in Dickie's bedroom.

Dickie was indicted on one count of third-degree misconduct involving weapons,[1] one count of first-degree stalking,[2] and one count of first-degree criminal trespass.[3] After the State presented its case at trial, Dickie moved for a judgment of acquittal on the stalking charge. Dickie argued that the State failed to prove that he engaged in a course of conduct that placed the Petersens in fear of death or physical injury. Superior Court Judge Philip R. Volland denied Dickie's motion. The jury found Dickie guilty of all three charges, and he now appeals.

### Discussion

Dickie raises two arguments on appeal. First, Dickie argues that the court erred in denying his motion for judgment of acquittal because the State failed to show that Dickie made repeated, nonconsensual contacts with the Petersens as necessary to satisfy the stalking statute. Dickie also argues that the trial court erred in failing to instruct the jury on the definition of the term "victim."

*The trial court did not err in denying Dickie's motion for judgment of acquittal.*

A person commits the crime of stalking when the person "knowingly engages in a course of conduct that recklessly places another person in fear of death or physical injury, or in fear of the death or physical injury of a family member."[4] The statute defines the phrase "course of conduct" as "repeated acts of nonconsensual contact involving the victim or a family member."[5] "[N]onconsensual contact" is defined as "any contact with another person that is initiated or continued without that person's consent, that is beyond the scope of the consent pro-

vided by that person, or that is in disregard of that person's expressed desire that the contact be avoided or discontinued."[6] Such contacts include "appearing within the sight of that person"; "entering onto or remaining on property owned, leased, or occupied by that person"; and "placing an object on, or delivering an object to, property owned, leased, or occupied by that person."[7]

Dickie argues on appeal that his conduct does not fall within the definition of stalking because his conduct does not meet the definition of "nonconsensual contact." Dickie argues that we should require an element of coercion or force as part of the phrase "without that person's consent" to address potential constitutional problems with the stalking statute. Because these claims raise questions of statutory interpretation, our goal is to determine the intent of the legislature and to implement that intent.[8]

In *Petersen v. State*, we noted that the phrase "without that person's consent" appears to cover all contacts that are not expressly authorized beforehand.[9] But we noted that this broad coverage is tempered by the other elements of the statute: "To establish the crime of stalking, the government must prove that the defendant knowingly engaged in repeated acts of nonconsensual contact, the government must prove that these nonconsensual contacts placed another person in fear of injury or death, and the government must prove that the defendant acted with reckless disregard for this result."[10] Because of these elements, we held that the stalking statutes do not criminalize nonconsensual contacts made for "legitimate purposes, even when the defendant knows that the person contacted may (or will) un-

---

1. AS 11.61.200(a)(7).

2. AS 11.41.260(a)(4).

3. AS 11.46.320(a)(1).

4. AS11.41.270(a) (defining second-degree stalking). Under AS 11.41.260(a), a person commits first-degree stalking if they violate the second-degree stalking statute and "at any time during the course of conduct constituting the offense, the defendant possessed a deadly weapon."

5. AS 11.41.270(b)(1).

6. AS 11.41.270(b)(3).

7. AS 11.41.270(b)(3)(A), (D), (G).

8. *Boyd v. State*, 210 P.3d 1229, 1231 (Alaska App.2009).

9. 930 P.2d 414, 425 (Alaska App.1996).

10. *Id.* at 431.

reasonably perceive the contact as threatening."[11]

■ Under the facts of this case, we likewise conclude that the requirements of the stalking statute pass constitutional muster even if we do not require the prosecution to show an element of coercion or force as part of the proof that the defendant's course of conduct against the victim was "without that person's consent."

In the stalking statute, the legislature did not provide a statutory definition for the phrase "without that person's consent" or for the word "consent." The word consent is generally defined as "[a]greement, approval, or permission as to some act or purpose."[12] "Without consent" then refers to the lack of agreement, approval, or permission.

Because the meaning of "without consent" appears to be clear from the dictionary definition, Dickie bears a heavy burden to demonstrate the legislature intended to adopt the meaning he advocates on appeal.[13] To satisfy this burden, Dickie must show that the legislature enacted the statute with the intent of requiring force or coercion to satisfy this element of the stalking statute.

Dickie does not point to any legislative history demonstrating that the legislature intended to require force or coercion where the defendant initiates contact without the victim's consent. Had the legislature intended to require an element of coercion or force, the legislature could have included a statutory definition similar to the statutory definitions in the sexual offense, kidnapping, custodial interference, and human trafficking statutes.[14] The lack of a similar definition in the stalking statute appears to indicate that the legislature did not intend to require force or coercion as part of the definition of nonconsensual contact.

■ We now turn to the evidence in this case. When we examine the sufficiency of the evidence to support a conviction, we view "the evidence in the light most favorable to the state and [ask] whether reasonable jurors could conclude that the accused's guilt was established beyond a reasonable doubt."[15] In this case, the evidence indicates that the first time Dickie arrived at the Petersens' residence, Dickie knocked on the door and asked for Sherry Anson. The daughter informed Dickie during that first encounter that "nobody lives here by that name." From that point forward, Dickie was on notice that Sherry Anson was not present at that residence and that his continuing contacts with the Petersens were without their consent.

Dickie then repeatedly stopped by the house and left food without attempting to contact the Petersens. When Mr. Petersen confronted Dickie, he gave a false name. Dickie's conduct suggested that he knew he did not have the Petersens' consent, that he possibly knew his conduct was criminal, and that he felt the need to operate with some degree of secrecy. Then, after Mr. Petersen told Dickie not to come back, Dickie returned to the Petersens' house with a gun. A juror could reasonably conclude that Dickie knew that his contacts with the Petersens were without their consent.

*The trial court did not commit plain error in failing to instruct the jury on the definition of "victim."*

Dickie argues on appeal that the court committed plain error in failing to instruct the jury on the definition of the term, "victim." Because Dickie's defense at trial was that he was looking for Sherry Anson, he argues that the court's failure to instruct the jury "permitted the jury to find that Dickie had engaged in stalking even if he did not target the Petersens."

■ Criminal Rule 30(a) states that a party who disagrees with a jury instruction must object before the jury retires to deliberate. When a litigant does not make a timely objection to the court's failure to pro-

---

**11.** *Id.*

**12.** *Black's Law Dictionary* 323 (8th ed. 2004).

**13.** *Stephan v. State,* 810 P.2d 564, 566 (Alaska App.1991).

**14.** *See* AS 11.41.370(3); AS 11.41.470(8).

**15.** *Simpson v. State,* 877 P.2d 1319, 1320 (Alaska App.1994).

vide a jury instruction, we review the claim for plain error.[16] In the context of jury instructions, this court will only find plain error when the lack of an instruction "creates a high likelihood that the jury followed an erroneous theory[,] resulting in a miscarriage of justice."[17]

 The stalking statute defines "victim" as "a person who is the target of a course of conduct."[18] The statutory definition of victim does not differ dramatically from the dictionary definition. A dictionary definition of this term includes "[o]ne who is harmed by or made to suffer from an act, circumstance, agency, or condition."[19] Black's Law Dictionary defines victim as "[a] person harmed by a crime, tort, or other wrong."[20] Because the dictionary definitions of victim do not differ significantly from the statutory definition, it is unlikely that the jury would have understood the term "victim" in a manner that differed significantly from the plain and ordinary meaning of the term.

Moreover, the lack of a jury instruction defining this term did not create a likelihood that the jury followed an erroneous theory. The jury instructions required the jury to find Dickie not guilty of stalking if they concluded that Dickie was mistaken about the object of his conduct. The jury instructions stated, "If you find that the defendant had a reasonable mistake of fact that he was not engaging in a 'course of conduct' . . ., then you must find him not guilty of Stalking in the First Degree." The instructions also defined the term "course of conduct" as "repeated acts of nonconsensual contact involving the victim or a family member."

Based on these jury instructions, Dickie's counsel argued to the jury that Dickie was merely mistaken about who was living in the duplex. In response, the prosecutor argued to the jury that Dickie was not mistaken about the fact that his conduct was directed at the Petersens.

We conclude that the jury was adequately instructed that they should find Dickie not guilty of stalking if they believed that Dickie was only looking for an acquaintance named Sherry Anson. The jury rejected this theory when they returned the guilty verdict. Accordingly, we conclude that the lack of an instruction on the statutory definition of the term "victim" did not create a likelihood that the jury followed an erroneous theory.

*Conclusion*

We AFFIRM the superior court's judgment.

---

**16.** *Heaps v. State,* 30 P.3d 109, 114 (Alaska App. 2001).

**17.** *In re Estate of McCoy,* 844 P.2d 1131, 1134 (Alaska 1993).

**18.** AS 11.41.270(b)(4).

**19.** *The American Heritage Dictionary of the English Language* 1990 (3d ed. 1992).

**20.** *Black's Law Dictionary* 1598 (8th ed. 2004).