NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>                    Appellant,<br><br>        v.<br><br>KENNETH JOHN JOUPPI and<br>KEN AIR, LLC,<br><br>                    Appellees. | Court of Appeals Nos. A-11819, A-11829,<br>and A-11830<br><br>Trial Court Nos. 4FA-12-3228 CR<br>and 4FA-12-3659 CR<br><br>O P I N I O N<br><br>No. 2551 — May 12, 2017 |

Appeal from the District Court, Fourth Judicial District, Fairbanks, Patrick S. Hammers, Judge.

Appearances: Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Michael C. Geraghty and Craig W. Richards, Attorneys General, Juneau, for the Appellant. Nelson Traverso, Fairbanks, for Appellee Kenneth Jouppi. Robert John, Fairbanks, for Appellee Ken Air, LLC.

Before: Mannheimer, Chief Judge, and Allard, Judge.

Judge MANNHEIMER.

The State of Alaska prosecuted Kenneth John Jouppi and the air carrier that he and his wife owned, Ken Air, LLC, for unlawful importation of alcoholic beverages into a "local option" community (*i.e.*, a community that had exercised its option under

AS 04.11.491 to prohibit the importation of alcohol). [1]  Following a jury trial, both Jouppi and Ken Air were convicted of this crime.

At sentencing, the district court denied the State's request to order forfeiture of the airplane involved. The State appealed the district court's refusal to order forfeiture of the airplane, and both Jouppi and Ken Air then filed cross-appeals, challenging their convictions on various grounds.

For the reasons explained in this opinion, we affirm the defendants' convictions, but we reverse the trial court's ruling regarding the forfeiture of the airplane. We conclude that, under the pertinent statutes, forfeiture of the airplane was mandatory.

*Underlying facts*

Kenneth Jouppi and his wife were the two principals of Ken Air, LLC, and Jouppi was the only pilot working for Ken Air. On April 3, 2012, Alaska State Troopers were conducting surveillance of Jouppi and his airplane at the Fairbanks airport. The troopers were there to execute a search warrant for the airplane (a warrant that had been issued in connection with another investigation).

As the troopers watched, two women — Helen Nicholia and Irene Todd — drove up to Jouppi's airplane. Jouppi was scheduled to fly Nicholia to Beaver, a local option village.

Nicholia and Todd's vehicle contained several boxes and semi-transparent grocery bags. The troopers observed Jouppi opening and closing these boxes and bags, and redistributing their contents to fill up the containers. Jouppi then loaded this cargo into his airplane (with no assistance from the women). Some of the boxes that Jouppi

---

[1]  AS 04.11.499(a).

loaded into the plane were open, and the others were loosely closed. Based on the way Jouppi was carrying the boxes, they appeared to be heavy.

Once the plane was loaded, Helen Nicholia entered the plane on the copilot side. Jouppi got into the pilot's seat, started the engine, and prepared to take off. (The other woman, Irene Todd, drove away.)

At this point, the troopers contacted Jouppi and had him shut off the engine. They then executed the search warrant.

When the troopers looked through the plane's windows, they could see beer in a plastic grocery bag sitting unsecured in the plane. The troopers later testified that this beer was in plain view, obvious to any observer. The troopers took additional photographs as they removed the cargo from the plane.

The troopers found beer in various boxes and bags onboard the plane; they removed this beer from its containers and seized it as evidence. The troopers then returned the boxes and bags to Nicholia, since these boxes and bags contained Nicholia's other groceries.

Based on this incident, Jouppi, Ken Air, and Helen Nicholia were all charged with importation of alcoholic beverages into a local option community, in violation of AS 04.11.499. Nicholia pleaded guilty to this charge. Jouppi and Ken Air invoked their right to trial.

*The defendants' request for a jury instruction on spoliation of evidence*

At trial, the defendants took the position that the troopers had improperly destroyed evidence by failing to take custody of, and preserve, the plastic grocery bags and the cardboard boxes that the beer was found in. (As described in the preceding

section, the troopers returned Nicholia's boxes and bags to her after they removed the beer.)

With respect to the Fred Meyer plastic grocery bags, the defendants argued that even though beer cans might be visible through the sides of a typical Fred Meyer grocery bag, there was a possibility that the grocery bags found in Jouppi's airplane were less transparent than a typical grocery bag, and that the beer might not have been visible through the plastic film of these particular bags.

With respect to the cardboard boxes, the defendants argued that, if the troopers had preserved these boxes, the defendants might have been able to demonstrate that all of the beer found in Jouppi's plane might have fit within these boxes when their tops were folded over and closed. Such a demonstration would potentially support Jouppi's position that Nicholia had concealed all of the beer in the cardboard boxes, and that none of it was visible to Jouppi.

Based on these arguments, the defendants asked the judge to instruct the jurors that, because the State failed to collect and preserve the grocery bags and the boxes, the jurors should assume that the grocery bags and the boxes would have been favorable evidence for the defense.

(This type of instruction is commonly referred to as a "*Thorne*" instruction, because this was the remedy granted in *Thorne v. Department of Public Safety*, 774 P.2d 1326, 1331-32 (Alaska 1989).)

The trial judge denied the defendants' request for a *Thorne* instruction. He noted that the police generally have no duty to collect physical evidence — only a duty to preserve the evidence once they have actually collected it. *See Selig v. State*, 286 P.3d 767, 772 (Alaska App. 2012). Here, the judge found that the troopers "did not lose or destroy any evidence". Rather, the troopers chose not to collect the evidence: they photographed the grocery bags and the boxes, and then they returned these bags and

boxes (along with the non-alcoholic groceries in them) to Nicholia, who was the owner of this personal property.

The judge concluded that the troopers had acted properly, and that the defendants were not entitled to the *Thorne* instruction that they requested.

On appeal, the defendants renew their claim that they were entitled to a jury instruction telling the jurors that, because the State returned the plastic grocery bags and cardboard boxes to Nicholia, the jurors should assume that this evidence would have been favorable to Jouppi's claim that he was unaware of any alcoholic beverages in his airplane.

We reject the defendants' argument for three reasons. First, we agree with the trial judge that, because the troopers never collected the bags and the boxes, they were not required to preserve them.

Second, with respect to the Fred Meyer grocery bags, the defendants offered no evidence that these bags are not uniform — *i.e.*, no evidence that there is a substantial variation in the coloration or thickness of Fred Meyer plastic film grocery bags, such that beer might be visible through the sides of one Fred Meyer grocery bag but not visible through the sides of another.

Third, with respect to the cardboard boxes, we note that (according to the evidence) the boxes contained other groceries besides beer. The defendants claimed that they needed these boxes so that they could conduct a demonstration to show that the beer found in Jouppi's airplane could have fit completely within the boxes when they were fully closed. But such a demonstration would be probative only if the parties re-assembled the *entire original contents* of the boxes — including the other groceries that belonged to Nicholia, and that were returned to her.

The defendants never claimed that the troopers were required to seize and preserve every item of Nicholia's personal property. And without all those articles of

personal property, no meaningful demonstration could be conducted, even if the boxes themselves had been preserved (or could somehow be retrieved from Nicholia).

Accordingly, we uphold the trial judge's decision to deny the defense request for a *Thorne* instruction.

*The defendants' claim that a state trooper was improperly allowed to offer an opinion on Jouppi's mental state*

During trial, Trooper Sergeant Kevin Yancey testified about the events that took place at the Fairbanks airport and the discovery of the alcohol in Jouppi's airplane. During the prosecutor's direct examination of Sgt. Yancey, the prosecutor asked Yancey to offer an opinion as to whether Jouppi had been "willfully blind" to the presence of the alcohol in his plane. Sgt. Yancey responded that he would *not* offer an opinion on "willful blindness" in a legal sense. But Yancey added that, based on his observations of the plane and its cargo, Jouppi would have had to be *physically* blind not to see the alcohol in the airplane:

> *Prosecutor*: Based on your observations of Kenneth Jouppi's interaction with the cargo in the back of [the] SUV [that Nicholia arrived in], and his loading of the aircraft ... , did you form any opinion as to willful blindness by Mr. Jouppi with regard to his knowledge of the alcohol in that plane?

> *Sgt. Yancey*: I wasn't using the term — the legal term "willful blindness" in my thought process, but it would have to be — he'd have to be blind not to know what was on [the plane], and absolutely ignoring whatever he was putting in that airplane. Just — there's just — pilots with that bad of eyesight don't fly.

On appeal, the defendants argue that Sgt. Yancey's above-quoted testimony was improper because it amounted to an assertion about Jouppi's mental state — an assertion that Jouppi acted with the *mens rea* required for the crime.

We disagree with this characterization of the trooper's testimony. Even though the prosecutor invited Sgt. Yancey to draw an inference about Jouppi's mental state, the trooper responded by saying that he was *not* offering an opinion on the issue of "willful blindness" in a legal sense. Rather, Yancey testified that, given the fact that Jouppi loaded all of the cargo himself, Jouppi would certainly have seen the alcoholic beverages.

The trial judge could reasonably conclude that Yancey's inference was based upon, and represented a summation of, Yancey's own observations of the cargo as it sat within the cabin of the aircraft. In the words of Alaska Evidence Rule 701, the judge could reasonably conclude that Yancey's testimony on this point was an inference "rationally based on [his] perception ... and ... helpful to a clear understanding of [his] testimony or the determination of a fact in issue."

For these reasons, we conclude that the admission of Yancey's testimony was not error.

*Defendant Ken Air's argument that it is entitled to a judgement of acquittal*

Defendant Ken Air argues that it is entitled to a judgement of acquittal because the evidence presented at trial was legally insufficient to establish that Jouppi was acting as an agent of Ken Air, and was acting within the scope of his employment, during the events of this case. More specifically, Ken Air argues that there is no evidence to show that Jouppi was flying that day as a Ken Air pilot, as opposed to flying on his own.

When a defendant challenges the legal sufficiency of the evidence to support a criminal conviction, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the verdict, and we ask whether reasonable jurors could conclude that the State had proved its allegations beyond a reasonable doubt. [2]

Jouppi testified at trial that he started Ken Air in Ketchikan in 1992, and he converted the company to a limited liability company in 2004. According to Jouppi's testimony, he was the "owner-operator" of Ken Air — i.e., both an owner of the business and an agent of the business.

Jouppi testified that Helen Nicholia arranged a charter flight with him on the day at issue in this case, and that Nicholia had booked charter flights with him in the past.

Jouppi agreed that, in his capacity as the "pilot/agent" of Ken Air, his activities "directly impact[ed] the bottom line of the organization" — that when he booked charter flights and collected fares, he was "making money for the organization and for [him]self." Jouppi also acknowledged that he made a practice of not checking his passengers' bags or boxes — partly because, if he searched his passengers' belongings and cargo, he would lose customers.

From this testimony, a fair-minded juror could reasonably infer that Jouppi was acting as an agent of Ken Air, and acting within the scope of his employment, when he came to the airport to pilot Helen Nicholia's charter flight, and when he loaded Nicholia's belongings onto the plane.

We therefore conclude that the evidence is legally sufficient to support the conviction of Ken Air.

---

[2] See, e.g., Augustine v. State, 355 P.3d 573, 587 (Alaska App. 2015).

*The State's contention that the district court was required to order forfeiture of the airplane*

Before the sentencing hearing in this case, the State filed a pleading in which the State asserted that, under the pertinent statutes, the sentencing court was required to order forfeiture of the airplane used in this crime. The district court initially concluded that the State was correct — that the pertinent statutes required forfeiture of the plane. But Ken Air sought reconsideration of this ruling, arguing that the court had misinterpreted the forfeiture statute. After hearing further argument on this point, the district court changed its ruling — concluding that forfeiture of the plane was not even authorized, much less mandated, by the pertinent statutes.

The question of whether the district court was required to order forfeiture of the airplane hinges on the interpretation of two statutes.

The first of these statutes, AS 04.11.499(a), is the statute that Jouppi and Ken Air were convicted of violating. AS 04.11.499(a) states that when a community has banned the importation of alcoholic beverages, it is a crime to "send, transport, or bring" alcoholic beverages into that community, or attempt to do so, or solicit someone else to do so.

A separate statute, AS 04.16.220, apparently authorizes the forfeiture of any aircraft used to facilitate a violation of AS 04.11.499. We say "apparently" because this forfeiture statute does not track the precise language of AS 04.11.499 when it defines which aircraft are subject to forfeiture. Rather, AS 04.16.220 declares that an aircraft is subject to forfeiture if it is used to "facilitate the transportation of alcoholic beverages *imported into* a [community] in violation of AS 04.11.499(a)."

Based on these two italicized words, "imported into", the district court ruled that even when an airplane is used to facilitate the unlawful transportation of alcoholic

beverages to a local option community, forfeiture of the airplane is not allowed under AS 04.16.220 unless the alcoholic beverages actually arrive in the local option community.

In the present case, the alcoholic beverages were intercepted before Jouppi was able to take off from the Fairbanks airport. Based on its interpretation of AS 04.16.220, the district court ruled that it had no authority to order forfeiture of the airplane.

The State argues that the district court misconstrued AS 04.16.220 — that forfeiture under this statute is not limited to instances where alcoholic beverages actually arrive illegally in a local option community. For the reasons we are about to explain, we agree with the State that the forfeiture statute should not be interpreted in this narrow fashion. Rather, the statute mandates forfeiture of any aircraft that is knowingly used to facilitate a violation of AS 04.11.499, regardless of whether the alcoholic beverages ever arrive in the destination community.

*The State's right to pursue this appeal*

Before we begin our analysis of the forfeiture issue, we must address the defendants' argument that the State has no right to appeal the district court's decision on this issue. Both Jouppi and Ken Air contend that even if the State is correct in saying that forfeiture of the airplane was mandatory under the pertinent statutes, the double jeopardy clause bars the State from seeking relief because the district court has already pronounced the defendants' sentences.

In some sense, the resolution of the defendants' double jeopardy claim has little practical importance, because the forfeiture statute — AS 04.16.220 — allows the

State to seek forfeiture of the airplane *either* as part of a criminal sentence *or* in a separate *in rem* proceeding against the airplane itself. *See* AS 04.16.200(d).[3]

The fact that Jouppi and Ken Air have already been sentenced for violating AS 04.11.499 does not bar the State from pursuing a separate *in rem* forfeiture action against the airplane — because the forfeiture statute declares, in subsection (g), that "it is no defense in an *in rem* forfeiture proceeding brought under (d)(2) of this [statute] that a criminal proceeding is pending or has resulted in conviction or acquittal of a person charged with violating ... [AS] 04.11.499".

Nevertheless, we will address the merits of the defendants' argument that the State has no right to appeal their sentences.

Under AS 22.07.020(d)(2), the State is entitled to appeal a final decision in a criminal case except "[as] limited by the prohibitions against double jeopardy contained in the United States Constitution and the Alaska Constitution."

If the State is correct that the pertinent statutes not only allow forfeiture of the airplane but actually *mandate* it, then the defendants' sentences are unlawfully lenient. And as this Court has repeatedly held, if a sentence is unlawfully lenient, the double jeopardy clause does not bar a court from increasing the sentence to the minimum extent required to correct the illegality.[4]

---

[3] This subsection of the forfeiture statute reads:

(d) Property subject to forfeiture under (a) of this [statute] may be forfeited
(1) upon conviction of a person for a violation of ... 04.11.499 ... or
(2) upon judgment by the superior court in a proceeding in rem that the property was used in a manner subjecting it to forfeiture under (a) of this section.

[4] *Grant v. State*, 379 P.3d 993, 994 (Alaska App. 2016), and the other six cases cited in footnote 3 of *Grant*.

Under Alaska law, the State has a recognized right to seek appellate review of an illegal sentence (and to seek correction of that sentence) by filing a petition for review — *i.e.*, a request for discretionary review.[5] The question here is whether the State is entitled to *appeal* an illegal sentence — *i.e.*, whether the State has the right to *demand* appellate review of the State's claim that a sentence is illegal.

As this Court explained in *Forster v. State*, 236 P.3d 1157, 1173 (Alaska App. 2010), the legislature enacted AS 22.07.020(d)(2) for the purpose of bringing Alaska law in line with the corresponding federal statute, 18 U.S.C. § 3731. (*See* SLA 1993, ch. 71, § 1.) The federal courts of appeal are split as to whether this federal statute authorizes the government to appeal an illegal sentence, and the legislative history of AS 22.07.020(d)(2) is silent on this issue. It is therefore not clear whether, under Alaska law, the State has a right to appeal a sentence on the ground that it is illegally lenient (as opposed to the right to seek discretionary review of the sentence).

But, as in *Forster*, we need not decide this point of law. Even assuming that the State has no right of *appeal* in the present case, the question of statutory construction that the State raises in this case has substantial public importance, not only in this case but in future cases. For this reason, even if we assume that the State's notice of appeal in this case should have been treated as a late-filed petition for review, we would grant review and reach the merits of the State's claim.

We now turn to the merits of that claim.

---

[5]  *State v. Laporte*, 672 P.2d 466, 469 (Alaska App. 1983).

*A closer look at the offense of "importation"*

The statute that Jouppi and Ken Air were convicted of violating, AS 04.11.499(a), is titled "Prohibition of importation or purchase after election".

The "importation" portion of the statute makes it a crime to send or convey (or try to send or convey) alcoholic beverages into a community if that community has voted to ban the importation of alcoholic beverages. The "purchase" portion of the statute makes it a crime for a resident of a local option community to purchase unlawfully conveyed alcoholic beverages.

The problem in the present case arises from the fact that, even though the title of AS 04.11.499 refers to the crime as "importation" of alcoholic beverages, the statute itself does not use the noun "importation" or any form of the verb "import" to define this crime. Instead, AS 04.11.499 declares that it is a crime for a person to knowingly "send", "transport", or "bring" an alcoholic beverage to a local option community.

In Alaska, section headings and the captions of statutes are not part of the law.[6] Thus, the fact that the word "importation" is used in the title of the statute to *describe* this offense has no effect on the actual legal definition of the offense. The crime is defined in terms of "sending", "transporting", or "bringing" alcoholic beverages into the local option community.

In everyday usage, the verb "import" means "to bring in from the outside".[7] Because the legislature has given communities the authority to ban the

---

[6] *See* AS 01.05.006; *Ketchikan Retail Liquor Dealers Ass'n v. Alcoholic Beverage Control Board*, 602 P.2d 434, 438 (Alaska 1979); *Lewis v. State*, 195 P.3d 622, 638 (Alaska App. 2008).

[7] *Webster's New World College Dictionary* (Fourth Edition, 2004), pp. 716-17.

importation of alcoholic beverages, the legislature could reasonably decide to enforce these community bans by penalizing all persons who are complicit in an unlawful importation.[8] We conclude that the legislature used the terms "send", "transport", and "bring" to define the scope of that complicity.

The notion of importation obviously includes the act of "bringing" alcoholic beverages into the local option community, in the sense of a completed delivery. But by adding the verb "send" to the definition of the crime, the legislature broadened the statute to include people who knowingly initiate the unlawful delivery, even though they may play no personal role in the actual transportation and delivery of the beverages. Similarly, by adding the verb "transport", the legislature broadened the statute to include middlemen who, at some stage, knowingly transport the alcoholic beverages toward the unlawful destination — even though these middlemen may not have initiated the sending of the beverages, and even though they may not personally complete the final delivery of the beverages into the community.

The wording of AS 04.11.499 actually goes farther than this — because the definitions of "send", "transport", and "bring" codified in subsection (c) of the statute additionally include any act of *soliciting* another person to do any of these three things, as well as any *attempt* to do any of these three things.

The act of soliciting another person to "send", "transport", or "bring" alcoholic beverages to a local option community would, in any event, make the person

---

[8] See the definition of complicity found in AS 11.16.110(2)(B) and AS 11.16.110(3). Together, these two provisions declare that a person is legally accountable for the criminal conduct of another person if, acting "with intent to promote or facilitate the commission of the offense", the person "aids or abets the other [person] in planning or committing the offense"; or if, "acting with [a] culpable mental state ... sufficient for the commission of the offense", the person "causes an innocent person or a person who lacks criminal responsibility to engage in the proscribed conduct."

an accomplice to the crime under AS 11.16.110(2)(A).[9] Thus, it is unclear whether the legislature's decision to include solicitation in the definition of the crime actually expanded the scope of criminal liability under the statute.

Similarly, any attempt to commit a crime is already punishable as a crime under AS 11.31.100 — although the punishment for an attempt is normally lower than the punishment for the completed crime. Thus, by including attempts as part of the definition of the substantive crime, the legislature did not expand the category of people who could be prosecuted; rather, the legislature effectively increased the penalty for an attempt.

Nevertheless, the legislature's expansive definition of this offense makes it clear that the legislature intended to cast a wide net. Even though the title of AS 04.11.499, "importation", might suggest a *completed* act of importation, the statute in fact authorizes the prosecution of practically all persons who knowingly involve themselves in any aspect of an endeavor to illegally import alcoholic beverages into a local option community — regardless of whether the alcoholic beverages are actually transported toward their destination, and regardless of whether the alcoholic beverages actually arrive in the community.

We now turn to the other statute involved in this case — the forfeiture statute, AS 04.16.220.

---

[9] This statute declares that a person is legally accountable for the criminal conduct of another person if, acting "with intent to promote or facilitate the commission of the offense", the person "solicits the other [person] to commit the offense".

*Our analysis of the forfeiture statute*

The specific forfeiture provisions at issue in this appeal are AS 04.16.-220(a)(3)(C) and (i)(1). Subsection (a)(3)(C) of the statute authorizes the forfeiture of "aircraft, vehicles, or vessels" that are used to "transport or facilitate the transportation of ... alcoholic beverages imported into a [local option community] in violation of AS 04.11.499(a)". Subsection (i)(1) of the statute declares that if the owner of an airplane is convicted of violating AS 04.11.499, and if the airplane is subject to forfeiture under subsection (a)(3)(C), then it *must* be forfeited. [10]

Taken together, these provisions mean that if the airplane in this case was subject to forfeiture under AS 04.16.220(a)(3)(C), then the district court was required to order forfeiture of that airplane. We must therefore decide whether the airplane in this case was subject to forfeiture under subsection (a)(3)(C) — in other words, whether the airplane was used to "transport or facilitate the transportation of ... alcoholic beverages imported into a [local option community] in violation of AS 04.11.499(a)".

As we have already explained, AS 04.11.499(a) was written to encompass practically all activities connected to the unlawful importation of alcoholic beverages into a local option community, whether those activities succeed or not — that is, regardless of whether those activities actually result in the delivery of alcoholic beverages into the local option community.

But because subsection (a)(3)(C) of the forfeiture statute uses the phrase "*imported into* a [local option community] in violation of AS 04.11.499(a)", the district

---

[10] More specifically, AS 04.16.220(i)(1) declares that, "upon [a person's] conviction for a violation of ... AS 04.11.499(a), if an aircraft ... is subject to forfeiture under [subsection] (a) of this [statute], the court shall, subject to remission to innocent parties [as authorized by this statute], order the forfeiture of the airplane to the state[.]"

court ruled that the scope of forfeiture authorized by this provision of the statute does not encompass all airplanes used to facilitate the transportation of alcoholic beverages into a local option community. Rather, the court concluded that forfeiture of airplanes under subsection (a)(3)(C) is strictly limited to instances where those efforts succeed — *i.e.*, where alcoholic beverages are actually delivered to the local option community.

Thus, the district court concluded, AS 04.16.220(a)(3)(C) does not even authorize — much less mandate — a forfeiture of the airplane in the present case.

It is true, as we noted earlier in this opinion, that the verb "import" normally means "to bring in from the outside". And because neither the charging statute, AS 04.11.499, nor the forfeiture statute, AS 04.16.220, contains a special definition of "import", it would normally make sense to apply this dictionary definition when interpreting the forfeiture statute. But we agree with the State that, in this particular context, the forfeiture statute's reference to "imported" should not be interpreted so narrowly that forfeitures are strictly limited to instances where alcoholic beverages are actually delivered into a local option community.

Although there are many rules of statutory construction, a court's primary goal is to ascertain the intent of the legislature and, if that intent can reasonably be ascertained, to implement that legislative intent. [11]

This remains the goal of statutory construction even though the wording of a statute is seemingly "plain". Even when a statute uses words or phrases that have a "plain" or commonly accepted meaning, Alaska law does not require a court to apply this meaning mechanically. Instead, Alaska courts use a sliding scale approach to statutory interpretation — analyzing the wording of the statute in light of the statute's legislative

---

[11] *Dickie v. State*, 282 P.3d 382, 384-85 (Alaska App. 2012); *Millman v. State*, 841 P.2d 190, 194 (Alaska App. 1992).

history, and in light of the statute's context in the legislature's greater statutory scheme — to see if this analysis reveals a legislative intent that differs from the "plain meaning" of the statutory language. [12]

In particular, when a statute is part of a larger framework or regulatory scheme, even seemingly unambiguous statutory language must be interpreted in light of the other portions of the regulatory whole. [13]

Here, the legislature enacted a trio of statutes that address the prosecution and punishment of people who are involved in the importation of alcoholic beverages into local option communities.

We have already examined the first two of these statutes: AS 04.11.499 (the statute that defines the offense) and AS 04.16.220 (the statute that governs related forfeitures).

The third statute that we must consider — a statute which we have not mentioned before — is AS 04.16.200. Subsections (e) through (g) of this statute set forth the penalties for violating AS 04.11.499. These penalties vary according to how much alcohol is involved, and according to the defendant's prior record. But this penalty statute draws no distinction between cases where the delivery of alcoholic beverages into a local option community is actually completed versus cases where the alcoholic beverages are intercepted before they reach the community.

We now return to the specific question before us: What does AS 04.16.220(a)(3)(C) mean when it speaks of the forfeiture of aircraft that are used to

---

[12]   *See Alaska Public Employees Assn. v. Fairbanks*, 753 P.2d 725, 727 (Alaska 1988); *Stephan v. State*, 810 P.2d 564, 566 (Alaska App. 1991).

[13]   *Lake v. Construction Machinery, Inc.*, 787 P.2d 1027, 1030 (Alaska 1990); *Hafling v. Inlandboatmen's Union of the Pacific*, 585 P.2d 870, 872 (Alaska 1978); *Millman v. State*, 841 P.2d 190, 194 (Alaska App. 1992).

transport or facilitate the transportation of alcoholic beverages "imported into" a local option community?

We have already explained that, even though the title of AS 04.11.499 uses the word "importation" to describe the offense, the actual wording of the statute demonstrates the legislature's intent to criminalize all aspects of any endeavor to bring alcoholic beverages into a local option community — all attempts to "send", "transport", or "bring" alcoholic beverages to these communities, regardless of whether those attempts succeed.

AS 04.16.220(a)(3)(C) authorizes the forfeiture of aircraft that are used to "transport or facilitate the transportation of ... alcoholic beverages imported into a [local option community] in violation of AS 04.11.499(a)". Based on the legislature's intent to broadly prohibit all attempts to introduce alcoholic beverages into local option communities, we conclude that the phrase "imported" into a local option community should not be interpreted in the narrow sense of "physically delivered" into a local option community. Instead, we interpret the word "imported" as a shorthand reference to the crime defined in AS 04.11.499 — similar to the way the word "importation" is used in the title of AS 04.11.499.

The defendants argue that the legislature might reasonably have concluded that the most serious violations of AS 04.11.499 are the cases where alcoholic beverages are actually delivered into a local option community — and that, for this reason, the legislature may have wanted to allow forfeitures of aircraft only in those cases.

But other than the use of the words "imported into" in AS 04.16.220-(a)(3)(C), there is nothing in the history or wording of the trio of interrelated statutes to suggest that the legislature intended to draw such a distinction — no indication that the legislature viewed cases where alcoholic beverages are actually delivered into a local option community as significantly more serious than cases where the alcoholic beverages

are intercepted by the authorities, or where the intended delivery fails for some other reason. Instead, as we have explained, the legislature intended to punish essentially all persons who knowingly involve themselves in any aspect of an endeavor to introduce alcoholic beverages into a local option community, regardless of whether the alcoholic beverages ever physically arrive in the community.

For these reasons, we reverse the ruling of the district court on the issue of the airplane forfeiture. Under AS 04.16.220(a)(3)(C) and (i)(1), the court was required to order the forfeiture of the airplane in this case. We therefore direct the district court to amend the judgements against the two defendants by ordering the forfeiture of the airplane.

*Conclusion*

The judgements against the two defendants are AFFIRMED, with the exception that those judgements must be amended to include forfeiture of the airplane.